THE STATE, CHARLES B. MORRIS ET AL., RELATORS, v. JAMES T. WRIGHTSON, CLERK OF THE COURT OF COMMON PLEAS AND GENERAL QUARTER SESSIONS AND COUNTY CLERK OF THE COUNTY OF ESSEX, IN SAID STATE.

THE STATE, CHARLES B. MORRIS ET AL., RELATORS, v. WILLIAM E. O'CONNOR, CLERK OF THE CITY OF NEWARK, ET AL., CLERKS OF TOWNSHIPS, &c., IN THE COUNTY OF ESSEX, IN SAID STATE.

1. The constitution delegates to the legislative department of the government the function of providing for the election of members of the assembly in the manner and subject to the restrictions prescribed by the constitution. A statute in the performance of that function is the exercise of a legislative and not a political power, and the constitutionality of the act by which such legislative power is exercised is a subject of judicial cognizance.

2. Citizens and qualified voters whose constitutional rights as electors are claimed to have been infringed by an election law have a standing in

court as prosecutors of a writ of *mandamus*, directed to election officers whose duties in relation to elections are purely ministerial, in order to test the constitutionality of the law under which elections are held.

3. Under the constitution, article 4, section 3, providing that the general assembly shall be composed of members "elected by the legal voters of the counties respectively," who shall be apportioned "among the said counties" according to population; and article 4, section 1, paragraph 2, providing that no person shall be a member of the general assembly who shall not be an inhabitant "of the county for which he shall be chosen;" and article 2, providing that every qualified voter who shall have been a resident of this state one year and "of the county in which he claims his vote five months next before the election, shall be entitled to vote for all officers that now are or hereafter may be elective by the people"—*Held*, that the members of assembly apportioned to any county are required to be elected by the legal voters of the county, and that an act of the legislature providing for the election of the members apportioned to any county in assembly districts, whereby each qualified voter residing in an assembly district is allowed to vote for only one of the members apportioned to the county, is unconstitutional.

4. Where the constitution prescribes the manner in which an officer shall be appointed or elected, the constitutional prescription is exclusive, and it is not competent for the legislature to provide any other mode of obtaining or holding office.

5. Contemporary and practical construction is entitled to great weight in the construction of constitutional provisions, as well as statutes, where the words are of doubtful signification or the meaning is obscure. But where the meaning of the constitution, interpreted by its letter and in its spirit, is ascertained, such extraneous considerations cannot be allowed to abrogate the text or fritter away its obvious sense.

6. An application for a *mandamus* to officers whose duty it is to give notice of elections, receive nominations and prepare ballots, requiring them to provide for elections as required by the constitution and not as prescribed by a statute, may be made before the time when such officers are required to perform such duties; and it appearing that they intend to act according to the statute, the writ will be allowed.

---

On application of Charles B. Morris and others for writs of *mandamus* to James T. Wrightson, clerk of Essex county, and William O'Connor, clerk of the city of Newark, and others, clerks of townships, &c., in said county, requiring them to conduct elections for members of the general assembly according to the constitutional provisions. Heard upon rule to show cause and depositions.

Argued at June Term, 1893, before Justices DEPUE, REED and LIPPINCOTT.

For the relators, *Richard Wayne Parker* (with whom were *Thomas N. McCarter* and *John R. Emery*).

By these petitions writs of *mandamus* are prayed—

First, to the clerk of the county of Essex, ordering him to receive nominations and issue official ballots and envelopes for the election of assemblymen on general ticket throughout the county, or if this relief cannot be granted, then to receive such nominations, issue such ballots by the districts created by the Reapportionment act of 1881.

And by the second petition, like writs are prayed to the clerks of the various municipalities in the county, ordering them to give notice of the election for assembly, to be held either by general ticket or according to the districts created by the last-named act.

The following points are taken by the petitioners : *First.* All election by districts is against the constitution of the state. *Second.* Even if districts be permissible, the so-called Reapportionment act of 1891 is a "gerrymander" of the most flagrant description and unconstitutional, as literally disregarding population and as massing it in certain districts so as to disfranchise most of the voters of the county. *Third.* The clerk of the county has a definite duty to perform in receiving nominations and issuing official ballots. His action is the foundation of all the machinery of elections. In it he determines and settles in what districts the members of assembly shall be elected. We ask that this action be according to law and not according to this unconstitutional act. We ask direction in a specific duty. *Fourth.* The clerks of the various townships and municipalities have a like duty to perform in giving notice of the time, place and purpose of the election, and should have like direction. *Fifth.* This application appeals to the discretion of the court as absolutely necessary to free and representative government, honest election and the con-

sequent honest administration of the state, and demands the court's prompt attention and control. *Sixth.* That there is no other remedy.

POINTS.

*First.* Election by districts unconstitutional.

The provisions of the constitution are fully set out in the petition.

It is definite—

The assemblymen are to be citizens of the county, apportioned "among the counties," not among the districts.

Elected by "the voters of the counties respectively," not by a few voters of each district.

They had been so elected for one hundred and fifty years, at the time of the constitution and continued to be so until 1852.

Before the constitution of 1844, and under that of 1776, three assemblymen were elected by general ticket from each county. By dividing counties, the legislature would double the number of their assemblymen. Shortly before 1844 counties had been set off for merely political ends. Each of the old counties then got six assemblymen. The revolt from this action was one of the principal causes for this convention, at which it was decided that the number to be elected by such county should be, as near as may be, according to the census of the United States.

By the constitution it was intended to curb legislative gerrymander. The system of election by the voters of the county was made a constitutional provision, but the number to be allotted to each county was fixed by census. It is not thought that when the constitution took away the power of the legislature to increase the assembly by dividing counties, it was meant to give a much larger power to divide the counties at will into districts and gerrymander them as political advantage should suggest.

When taking away legislative power to multiply assemblymen by multiplying counties, it was not intended to give the

legislature power to create new and artificial districts of all shapes, styles and forms, of such population as politicians might think best on considerations that naturally would be dictated by the local political leaders of every ward, districting by artificial local boundaries, of which the legislature, as a whole, could know nothing.

This system of stacking and piling the political cards has proved itself the mere tool of politics on both sides. It has become a national evil—the subject of a president's message—breeding horseshoe districts, shoe-lace districts, rainbow districts and other abominations by which mere politics defeat the honest will of the people.

Nor was it intended to change the character of the members of assembly. Theretofore they had been men of county reputation, who could stand in a county election and win upon the judgment of the voters of the county, as a whole. It was not intended that assemblymen should be mere local ward bosses or those who had the favor of those bosses in the primaries. See 1 *Bryce Am. Com.* 463, also *Fiske Civ. Gov. U. S.* 216, 217, as to the history of the gerrymander.

It is beyond all question that, under the district system, there have been members from the county of Essex who never could have been elected upon a county ticket.

The inquiry is not confined to Essex. It is one in which every judge must have had experience in all the larger counties of this state.

The system is an abuse which must be brought to an end in the interest of the whole people. It is proved by experience and found wanting. The handwriting is on the wall.

Time has elapsed; but no time runs against the public nor against the constitution.

We ask direction only. If we asked the court to derange the government, to turn out the members of the legislature and to inquire into the legality of their office, there might be hesitation, but not when the court is simply asked to direct the proceedings of future elections, so that they shall be in accordance with the constitution and the law.

*Second.* Even if districts can be made, the districting act of 1891 is unconstitutional as being without regard to population.

If the legislature had the power to create districts, those districts must be substantially in accordance with the number of population, as near as may be, by the last census.

A much stronger case has been decided in New York. In that state the county supervisors divide the county into districts. By the constitution of 1844 they were ordered so to do, and as near as might be in accordance with population. In the revision of the constitution, that clause was left out and division ordered purely to secure the indivisibility of towns and contiguity and convenience of territory. Nevertheless, the Court of Appeals of New York state, reversing the General Term, have held, in April last, that population must be regarded, and that, while perfect equality is impossible, yet any division which shows on its face that population has been disregarded, is unconstitutional and void. The court further held that districts varying in population from thirty thousand to a hundred thousand, so that one contained three times as many as the other, was a division that any fair man would hold to have disregarded the population.

The principle is thereby established that the division must be, as near as may be, in accordance with population, even when the constitution is silent upon that point.

By the decisions of the courts of Michigan, a further principle is established, to wit, that if the legislature disregards this principle (which in that state is expressed in the constitution), the law is void, and the court will direct the secretary of state, in giving notice of the next election, to go back and pass over every districting which was not in accordance with principle, until one was found that was fairly in accordance therewith ; that the court would not look into the intention of the legislature, but that it would inquire and decide whether the law was or was not in fact constitutional.

I call attention to *Giddings* v. *Blacker*, 52 *N. W. Rep.* 944, decided July 23d, 1892, in the Supreme Court of Michigan, all three judges giving careful opinions. Also, in Wisconsin,

*State* v. *Cunningham,* 51 *N. W. Rep.* 724.   Also a very recent case in Indiana.

In the county of Essex there are eleven thousand five hundred in one district, forty-two thousand three hundred in another, with every variety between.

The districting, as contained in the law, is not according to wards or old divisions of the county, but according to various lines taking in pan-handles and projections from one ward into another, without reference to population, and closing with a district which almost surrounds the whole county.

The results speak.   Eight assemblymen out of eleven were elected by the party casting over one thousand three hundred less votes than the party who only elected three.   May I ask, when appealing to the discretion of the court, that they will look at the results in the state.   See the crazy-quilt of so-called districts.   Look at Camden, varying from ten thousand five hundred to sixty-two thousand; look at Monmouth, with part of one district an island in the middle of another, and say if this is representative government.

As to effect of small districts, see 1 *Bryce Am. Com., ch.* XL., *p.* 463.   Also, *Bag., pp.* 215, 216.   As to history of gerrymander, see *Fiske Civ. Gov. U. S., pp.* 216, 217.

Kings county, New York, districting case—*People of New York, ex ad. Baird,* v. *Supervisors of Kings County,* 33 *N. E Rep.* 827.   As to Michigan senatorial districting, see *Giddings* v. *Blacker, Secretary of State,* 52 *N. W. Rep.* 944.

As to Wisconsin districts, see *State* v. *Cunningham,* 51 *N. W. Rep.* 724.

*Third.* The county clerk of Essex county, under the Ballot Reform law of 1890, has a definite duty to perform which controls the whole election.   He must prepare the official ballots and official envelopes.   Sections 25, 32.   These are to be separately endorsed for each assembly district.   Section 33.   The ballots are to be prepared separately for each party from nominations received by the clerk.   Section 32.   These nominations are either by conventions of a party which cast five per cent. of the total vote cast in the political division for

which the officer is to be elected (section 26), or by petition signed by at least one per cent. of the voters of such political division.   Section 28.

No other names of candidates can be printed on such ballots.

No other ballots can be used.

They can be corrected by writing or pasters, but only by writing one name in the place of the name appearing upon the ballot.

Under this law the clerk now issues a ballot, say, in the township of Montclair, where Mr. Charles B. Morris resides, endorsed for the eleventh assembly district of the county of Essex.   Upon the face of it are the words, "For Assembly-man," with the name, and the voter is bound to vote that ballot for some name, and therefore to vote for an assembly-man in the eleventh district, as created by the act of 1891. The districting created by that act we maintain to be void.

If the districting is unlawful the clerk should receive nominations from conventions of the whole county, or by a petition of a proportion of voters of the county, for the election of the eleven assemblymen, and each voter should have the opportunity to vote for eleven assemblymen upon his ticket.

If, on the contrary, districting is lawful, but the districting created by the act of 1881 is unlawful, the court should direct how nominations should be received and the ballot prepared. Eleven assemblymen were apportioned to Essex county in 1891.   So far the act is lawful.   Essex county had only ten before.   The court may order eleven assemblymen voted for by general ballot, unless they think they can order ten to be voted for by the districts of 1881 and one upon general ticket. But this I doubt.

The districting of 1881 was on its face fair, the population varying only from eighteen thousand to twenty-one thousand in the different districts.   Only one ward was divided.

The reception of the nominations is the first act of the election machinery to be performed by an officer now in existence,

and it controls the citizen in voting. Any variance in the ballot, except mere substitution of a name, makes it a marked ballot and void. Courts should direct the officer to proceed according to law in preparing the ballot that so controls.

*Fourth.* The township and municipal clerks of the county have likewise a definite duty to perform.

Townships and municipalities fix the polling places and pay for them. By the Election law (*Rev.*, § 131) it is enacted that, for the purposes of the act, the term "township" shall include any city, borough, ward, election district or precinct in which any election shall be held under the act.

By section 9 (*Rev.*, *p.* 338) the clerk of each ward and township shall, at least eight days prior to the day of election, put up or cause to be put up an advertisement in five public places, making known the time, place and purpose of holding such election.

The form of such notice is given in *Exhibit R* 4.

These notices are inserted simply to show the form. They state the assemblymen to be elected and for what district, and the place where the polls will be opened for each election precinct. They are the notices to the citizens under which the election is held.

These notices, too, should conform to the law and be given either for the election of assemblymen by general ticket throughout the county or according to the law of 1881.

The court should so command.

*Fifth.* This application appeals to the patriotic discretion of the court, and demands its prompt attention as essential to representative and honest government. The relief found is under the constitution and not on party lines. The mode of election by general ticket may not be to the advantage of any party. It is for the benefit of the state.

*Sixth.* There is no other remedy.

The assembly is judge of the election of its members, and *quo warranto* would not lie against its decision.

*Quo warranto* taken after the election would not be concluded before the session of the legislature.

*Quo warranto* taken after election would derange the government of the state by making it uncertain who were elected.

It is so important that there should be no dispute who are members of the legislature of the state, and no interference with its prerogatives and the control that is vested in the houses themselves, that the court cannot interfere with the question of membership.

But the courts can and should direct that the election should be lawfully held. They are loath to interfere afterward with mere formalities, with the freedom of election on the day that it is held, with even the count and the return; but, on the broad legal principles that are here laid down, they not only can, but should, direct what officers are to be elected and in what district, and that the clerk of the county, in receiving nominations and preparing ballots for such election, shall do so according to law, and not as had been done, against the law.

The court will prefer to do this beforehand. It would not be fair to wait until the ballots were cast and then to ask directions as to the count; nor can such application for directions as to count be now made, since the returning officers are not yet appointed.

Nor could any directions be given to the election officers, whose duty is merely to receive such ballots as are offered and who can only count official ballots.

The only remedy is in having a proper official ballot prepared by the clerk of the county of Essex, and we ask the court to direct the clerk as to that ballot and as to the reception of nominations of which that ballot is the result.

If this be not the remedy, there is no remedy for the abuses that threaten us from the unchecked rule and certain machinations first of one party and then of another, each overthrown only when the abuses come to such a pass that all parties unite to overthrow it.

The fair districting of this state, if districting be lawful, cannot be wholly trusted in the hands of any political party.

After suffering it for years, the courts of the United States

have at last concluded that they must assume control and direct that popular elections be held according to law.

### ARGUMENT.

#### A. History of Election by Counties.

County election was universal in the history of the state till 1852.

We begin with the colonial government of Lord Cornbury. From the beginning, the election of an assembly to represent the people was regarded as the foundation of freedom and free institutions.

The models of government in East and West Jersey, begotten by proprietors who never saw the people they wished to govern, are chiefly important as showing how attached the people of this state were to English representative government. The whole proprietary government fell into disorder. It was not only the recommendation of the English board of trade, but the wish of the people here, that the crown should constitute a governor by commission, with "such powers as might be necessary to establish a regular constitution of government by a governor, council and general assembly, with other civil and military officers." Thereupon the commission to Lord Cornbury was issued, with full instructions as to the government he was to organize, and which, in direct succession, is the parent of that we enjoy to-day. By his commission, the legislature was to consist of himself, the council of the province, to consist of at least seven men appointed by the crown (*Leam. & Spi., p.* 649), and a "general assembly of the freeholders and planters elected by the major part of the freeholders," and that he, with the advice and consent of the council and assembly, or the major part of them, respectively, should have power to make laws. *Id., p.* 650.

In 1709 we find that representatives were elected on county tickets by freeholders holding one hundred acres or worth £50, and that no person was eligible unless he held a thousand acres or was worth £500. Perth Amboy, Burlington

and Salem were the only boroughs, and each had two representatives, as well as the counties of Bergen, Essex, Middlesex, Somerset and Monmouth in the eastern division, and Burlington, Gloucester, Salem and Cape May in the western. Candidates must have resided and held land in the division from which they were elected. *Allin. L.* 1709, *p.* 10.

In 1725 a more careful election act provided for proper notice to be given by the sheriff (then an appointed office) of all elections, for clerks of the poll to keep a careful poll-list, for an oath to guard against fraudulent multiplication of freeholds, for a fine on any person making a false return to a writ of election. With the exception that representatives were given to new counties organized, few changes were made in the simple system of election until the revolution. Assemblies were called together by writs of election, issued by the governor as he saw fit, from time to time.

When William Franklin, governor of New Jersey, left the state in 1776, there was no legislature able to pass a law, and no person to call one together. The council were principally tories. The assembly, therefore, had to act alone, and our constitution was adopted by the representatives of the state " in congress assembled," providing that the government be vested in a governor, legislative council and general assembly (*Const.* 1776, § 1), chosen annually (*Id.,* § 111), each county choosing one member to the council and three to the assembly ; councilmen to be inhabitants and freeholders in the county, worth at least £1,000 ; and assemblymen, inhabitants worth £500 and elected by inhabitants worth £50. The council and assembly in joint meeting to choose the governor. This was our form of government until the constitution of 1844.

The constitution of the legislature remained the same until 1844, as above stated, but the machinery of election was changed from time to time, as it has been since. By *Pat. L.* 1797, *p.* 229, polls were opened in each township or precinct, the nominations having been previously handed to the county clerk, by him transmitted to the town clerks and by them advertised, and on election day and the day following the judge

of election, assessor and collector, being regular town officers (*Id., pp.* 233, 284), received the ballots, appointed a clerk, who kept a poll-list, counted votes and certified the election to the county clerk, who thereupon added the votes and gave his certificate in duplicate, one to the officer-elect and the other to the governor.

In 1844 our present constitution was adopted. The legislative power was vested in a senate and general assembly. The senators, one from each county, are elected for three years; the assembly is composed of members annually elected " by the legal voters of the counties," and apportioned among the counties according to their population by the last United States census. Article 4. The governor is elected by a popular plurality—a tie being decided by the legislature in joint meeting.

By the *Revised Statutes* (*p.* 409) the conduct of the election itself was not materially altered, but after the election the returns, instead of being sent to the county clerk, were ordered to be given to one of the judges of election of the township, who, with his fellows from other townships, constituted the board of county canvassers, who certified statements of the result of the election, one to the county clerk and the other to the secretary of state. *Id.*, §§ 68, 69. Of this statement the county clerk delivered copies to each person elected (*Id.*, § 79), while the returns filed with the secretary of state come before the board of state canvassers, composed of the governor and at least four of the senate named by him, whose decision and statement of the result of the election was filed with the secretary of state, and a copy sent to the senate and house, as *prima facie* evidence of the right of the members-elect to take their seats.

The above statement of history is taken from an article of 1881, in the "New Jersey Law Journal." In it is added:

"Since the year 1852 members of the assembly have been elected by districts under the law of that year (page 462) and

its supplements. It is, perhaps, questionable how fully this sort of election complies with the wording of the constitution, that members of assembly shall be elected by the voters of the county. It is not easy to maintain that a member of assembly is elected by the voters of his county, when he is really elected by the voters of a little district, but it is hardly questionable that the change was unwise. The reapportionment of districts has been a ceaseless bone of contention. It is corrupting to the people and to parties to make gerrymandering an element of political power. The power gained by the greater counties in the legislature, in an election by general ticket, was a compensation to them for being outvoted in the senate by the sparsely settled districts. That compensation no longer exists. What is more, the best men with a county reputation are welcomed on a general ticket because they add strength to it, while they may have no chance in the politics of a small district."

There is nothing in the history of this state to indicate that the founders of our constitution had in mind anything but what they said—election by the voters of the county—by all the voters—voting for each man. They were familiar with that system—that only. They intended to perpetuate it. The safeguard given by the United States census is only a safeguard if that system be followed. If election by districts had been known then, it might have been argued that it was to be followed, if it were not prohibited. It was unknown, and election by county ticket was made the constitution of the state.

### B. Lapse of Time no Defence.

This is because, as Blackstone says, the king is supposed to be so busied with public duties that he may not notice the injury.

Injuries to the state may not seem to do damage for years. Districting may be fair. It was probably intended at first to be fair. It was not contemplated by our wise constitution, because it might become unfair. Only when that result took

place to the fullest extent do citizens feel that the rights of the state should be protected.

See *Cross* v. *Morristown*, 3 *C. E. Gr.* 311, 313.

How unfair, is seen in the facts and map.

In 1871, the horseshoe district was created in Hudson—an exception, perhaps, to meet a special case—but with a much larger population and disregarding ward lines. In 1891 we find a system. In Essex, eleven thousand five hundred population have the voting power of forty-two thousand. In Camden, ten thousand five hundred have that of sixty-two thousand. In Monmouth, part of one district is an island in the middle of another. In the whole state is the same inequality, and the map is a crazy-quilt of artificial lines.

### C. Counties as Natural Districts.

Counties have much in common. It is of importance that election districts should not be independent of those divisions that form a community. Only in community do men know each other. Three mutual interests bind them together. They meet at the same courts, pay the same taxes, read the same newspapers. They have their county leaders in thought and business, men known to them as fit to represent them.

The division might have been made by towns, as in England. We preferred counties.

But in each case it was a division, not by mere population, but on considerations of greater import—contiguity, mutual interest and community—without reference to which no free government has ever been judicially administered.

The great principle of local self-government always regards localities. It is one of local divisions, growing up like counties naturally—not of arbitrary divisions. The representative is of an organization. The brain represents the body, but there is no like representative of a leg or an arm, and so no representative can be found of these surgical autonomies created by these various acts.

The constitution meant this—county men to represent the

county. It might have asked for town men to represent a town. It did not. And it never meant to ask for district men to pretend to represent an artificial district that has no autonomy or personality to represent.

The provision governs the system of election.

The system of election differs from its machinery and details. The system is provided by the constitution; the manner is ordered by the legislature.

The system lies at the foundation of government—what legislative bodies shall represent the people, from what districts, for what terms, when elected, who shall vote.

The manner is a question of police; the hours of polling, the polling places, form of ballot, manner of casting it, the poll-list, judges, returns, registry, all these are fully in control of the legislature.

But legislatures cannot alter the constitutional system under which they have their own existence. Otherwise they may alter it to perpetuate themselves, the ordinary process by which republics come to an end.

The districts by which they are elected is not mere machinery of election, but part of the elective system. Take other examples. It would certainly be a reversal of the presidential system of election if the electors were chosen by general ticket and not by the states. If they were chosen by general ticket it would be a like alteration to elect them by states. The difference in districts is at the foundation of the system.

A representative is one who represents—what? The people of the district from which he is chosen. Change the district and you change the system of representation.

Borough representation, district representation, county representation, representation by general ticket—these are constitutional changes in the electing system. *Scrutin d'arrondissement* and *scrutin de liste*, election by district and by general ticket, are the questions of questions in France.

Our constitution provides for county representation for members representative of the county, chosen by the electors of the county.

If chosen by districts they are not representatives of the county but those of a district.

The right of the voter is part of the system of election. By the constitution he is given the right to vote for certain officers. The electors of the county (each of them) are given the right to vote for the representatives of that county, not for one only but for any or either. Election by districts takes away that constitutional right.

The fact that change of districts does affect the system is shown by the fact that it affects the results. Change of the machinery could have no such effect. The time, place and manner of holding the polls, registry, secret ballot, the Australian ballot and every mere regulation that can be devised by way of police, have no effect on the vote or its result, but change of districts does affect the majorities and the election itself. It is a change, not of machinery but of system, and that system was not put in the control of any legislature, or of its party majorities, but laid down in a firm constitution.

Assembly districting has been held in this state to be extraconstitutional, but its lawfulness has never come before the courts till now.

The districting of 1852, 1861 and 1871 never came before the courts.

In 1879, in the case of *State, Gardner, pros.,* v. *Newark,* 11 *Vroom* 287, application was made for a *mandamus* to change the aldermanic wards to correspond with new districts created by the Redistricting act of 1878. The counsel for the city attacked that act on various grounds, as local, &c., and also because it was unlawful to district more than once in ten years. He insisted that districting was lawful, but that it was done under the constitution, and could only be done once after each census.

His argument admits the right to district, and urges that it is done under the constitution.

The court, on the other hand, decided that districting was extra-constitutional, not provided for therein, and a legislative act not governed by any direction of the constitution and un-

fettered thereby. The decision is *obiter*, for *mandamus* was refused on other grounds, but the court expressed no opinion on the legality of districting, which was not before them, but said simply that as districting was extra-constitutional, it was not limited as to time by the provision as to apportionment.

I quote the language from 11 *Vroom* 300 :

"At the time of the adoption of the constitution of 1844, the present system of legislative districts was unknown.

" Each county elected its member or quota of members from the county at large.

" It is to the apportionment of the number of representatives to which each county was entitled, that the above section obviously refers.

" The breaking up of the counties into smaller districts, for the purpose of securing closer local representation, was a subsequent measure.

"At the time of the incorporation of this section in the constitution, these districts were not in the mind of the convention. The only restrictive force of the section is relative to the apportionment among the counties. That this apportionment must remain from the time of the taking of one federal census to the time of taking another, is clear.

" But the power of the legislature to direct the method in which the members so apportioned shall be elected within the county is unfettered.

" That purpose is all that the present Reapportionment acts attempt to accomplish, and the acts are not inimical to this constitutional provision."

This case did not thus raise the question, but the very different one whether the constitutional limit of time applies to districting.

The first and only case in which it was attempted to raise the question now mooted was in *Mortland* v. *Christian*, 13 *Vroom* 538, on *quo warranto* as to the office of freeholder. A recent statute had substituted a board of freeholders elected by assembly districts for a board elected by townships and wards in Essex and Hudson.

The court uses the following significant language:

" Referring to the suggestion made on the argument, that the assembly districts which, by this act, are referred to as the precincts for the election of freeholders, were not legal legislative creations, inasmuch as the constitution contains no intimation but that members of assembly shall be chosen by the counties at large, it is sufficient to say that we are not now concerned with the legality of such subdivisions of counties. The act under review refers to these districts for the purpose of defining a territorial limit. Such precincts or assembly districts do exist, whether legally or not, and to each of these *de facto* districts a freeholder is assigned. Beyond this we need not, at this time, go."

The courts of New Jersey have thus never touched this point. They have decided that districting assembly districts is outside of the constitution and its lawfulness in doubt. They have done no more.

Neither under the United States constitution nor under the constitutions of the several states, has districting ever yet been held to be lawful without an express constitutional provision to that effect.

The United States constitution : One of the most striking instances is the districting law of the United States as to congressional elections. It has not only never been held constitutional, but has been disregarded wherever any contest was had.

The United States constitution gives much more power to congress than is given by ours to our legislature. By article 1, section 2, the house of representatives shall be composed of members chosen every second year by the people of the several states, and the electors in each of the states shall have qualifications requisite for the electors of the most numerous branch of the state legislatures.

By section 4, the times, places and manner of holding elections for senators and representatives shall be prescribed in each state by the legislatures thereof, but congress may at

any time, by law, make or alter such regulation, except as to· the place of choosing senators.

It is obvious that, as the most numerous branch of the· legislature is usually elected by districts, congressmen would naturally be elected by districts.  What is more, there is an· express grant of power to congress to designate the times,· places and manner of holding elections.

Many of the states had early held their elections by dis- tricts, and in 1842 the United States attempted to make this compulsory by the law now standing on the statute books; nevertheless, whenever the states have refused to elect by dis- tricts and have elected members by general ticket, those mem- bers have been received by the house of representatives.

The matter received the attention of the house of repre- sentatives for several months in 1843 and 1844.   Five or six states at that time sent members elected by general ticket. Stephen A. Douglas, as chairman of the majority of the com- mittee on elections, reported that they had the right to do so, notwithstanding the statute, and his report was sustained in the house.   In the debate it was admitted that the states had the right to district if they pleased, not only under the reserved power, but because, by the constitution, they had the right to fix the qualifications of electors and to say for whom they should vote.

But it was insisted with the utmost force· that the system· of elections was not within the power of congress, but pre-- scribed by the constitution ; that by the constitution that sys- tem prescribed the term of office, the time of election and the· manner of electing, the term two years, the place in the state, the manner by the electors entitled to vote for the most numerous branch of the legislature, and that congress could not change these provisions, and especially that the provision as to. the elective franchise included within this subject the district within which the votes should be cast, the number of representatives that each man should have the right to vote· for.   The persons who were entitled to vote for each repre- sentative were left to the states, and that the United States

could not force them to district and modify their own determination in these matters against their will.

On the other hand, it was admitted that, so far as police was concerned, the United States could prescribe where the voting should be done, enact registry laws and generally control the mere details and machinery.

The whole debate is most instructive, for, while it proceeded somewhat on the lines of state rights, the higher constitutional grounds were thoroughly discussed, and the point was taken by more than one speaker, especially by one gentleman from Missouri, that the power to district the states involved the power to throw the bulk of the voters into certain districts, and thus would enable congress to perpetuate its own power by holding elections in such a manner as to defeat the will of the states, by whom, under the constitution, representatives were to be chosen. It was suggested that the region above St. Louis might be thrown into one district and the rest of the state into another, and that considerations of population might not be regarded.

The determination of the house of representatives was that the statute of the United States should not be deemed to be compulsory, but should only have force so far as it was accepted by the state itself, and that there was no power under the constitution to district or to compel districting against the will of the state. This decision was followed in a subsequent case from Minnesota. The discussions are to be found only in the pages of the "Congressional Globe." I refer to this case 1 *Bart. Cong. Cont. Elect., p.* 47 ; 2 *Id., p.* 55.

The power of the United States so to district has never been determined in the courts.

In none of the other states other than our own has districting ever been attempted by the legislatures, except where the constitution provided for it. Wherever, under the constitution of the state, special members are to be elected by the county, the district or a town, they are elected upon general ticket.

An instructive article on this subject is found in 12 *N. J. L. J.* 363, and especially pages 367 and 368.

I have examined the constitutions of the various states, and also their laws. Many of them, and especially the southern states, retain the system of election by counties on general ticket, while the New England states retain the system of election by towns on general ticket. For example:

Alabama: One hundred representatives, "apportioned among the several counties of the state, according to the number of inhabitants in them respectively," as ascertained by the census of the United States.

"It shall be the duty of the general assembly   *   *   * to fix by law the number of representatives, and apportion them among the several counties of the state ; *provided*, that each county shall be entitled to at least one representative." *Const.* 1875, *art.* 9, §§ 2, 3.

In the Apportionment act the legislature complied exactly with this constitutional enactment, not dividing the counties into districts, but apportioning the representatives among the counties at large. *Pamph. L.* 1881, *p.* 117.

Arkansas: Constitution of 1874, article 5, section 2, the house of representatives are elected by qualified electors of the several counties. There is no provision in the laws for districting the counties.

Connecticut: By the constitution of 1818, article 3, section 4, provided for a senate of twelve, chosen annually by the electors. *Rev.* 1875.

By an amendment of 1828 these were chosen by districts. By article 3, section 4, the house of representatives consists of electors residing in the towns for which they are electors, the number apportioned to each town being the same as at that time, new towns to receive one assemblyman and old towns to keep the same number as before.

By article 15 of the amendment of 1874 towns of over five thousand people by the preceding census are to have two representatives.

There is no districting of towns that I can find.

By the constitution of Delaware seven representatives are to be elected in each county unless a greater number is thought necessary, while provision is made as to certain cities for three representatives from each city. The legislature never attempted to district.

By the Georgia constitution (last revision, sections 5040, 5042), article 3, section 3, paragraph 1, one hundred and seventy-five members are to be elected, and in three counties each elects three; in twenty-six counties each elects two, and in one hundred and five counties each elects one. They are elected by general ticket, and there is no law for districting.

By section 5040 of the code of 1882, senatorial districts are to be as then arranged by counties, and the legislature may change districts, but not increase their number or the number of senators.

Florida: " The representation in the house of representatives shall be apportioned among the several counties as nearly as possible according to population." *Const.* 1885, *art.* 7, § 3.

The legislature complied strictly with this provision; no division of counties into separate districts was made, but the apportionment of representatives was made among the counties at large, *Pamph. L.* 1887, *ch.* MMMDCCIII.

In Illinois, by the constitution of 1870, articles 4, 5, 6, 7 and 8, there are fifty-one senatorial districts, composed of contiguous and compact territory bounded by the county line. No district is to be of less than four-fifths of the senatorial ratio. The house of representatives, as well as the senate, are elected, three in each district, with the provision that votes may be plumped or thrown all for one man, or distributed at the will of the elector.

By the constitution of 1848, section 10, senatorial and representative districts were to be of contiguous territory bounded by county lines, and only one senator and not more than three representatives were to be apportioned to each, with the provision that a town with the requisite population might be made a separate district.

The constitution of Indiana provides for districting.

In New York, by the constitution of 1777, article 4, a number of representatives were apportioned to various counties without districting. The senate was to be elected by four great districts.

By the constitution of 1801 the apportionment was to be among the counties according to the census. By the law of 1821 there were to be eight senatorial districts, each choosing four senators, while by article 1, section 7, members of the assembly were to be chosen by the counties and apportioned according to the census. There was no districting. The constitution of 1846 ordered division of the counties into districts by the supervisors, and the election of a single man to each district.

Thus, in New York, districting was done by the constitution and not by the legislature.

In Pennsylvania, article 2, section 16, every city entitled to more than four representatives and every county having over one hundred thousand population, is to be divided into districts of compact and contiguous territory, each district to elect its proportion of representatives according to its population, but no district to elect more than four representatives. Here, also, the general ticket is retained.

By the constitution of Massachusetts, chapter I., article 1, election is by towns. Larger towns elect more than one. By the twenty-first amendment the election is by representative districts of contiguous territory, none to elect more than three representatives.

By the constitution of Maryland, of 1867, each county is to elect from two to six members, according to its population, and there are also three legislative districts in the city of Baltimore which elect six members each.

By article 3, section 7, of this constitution, the house of delegates are to be elected by qualified voters " of the counties and the legislative districts of Baltimore respectively."

This is substantially the provision in New Jersey, and

there is no attempt by the legislature to cut these counties or legislative districts into single districts.

By the constitution of Louisiana, as contained in their code of 1867–68, article 2, representatives are apportioned among the various parishes and representative districts, and by article 22 until apportionment shall be distributed as follows (the distribution giving one to four to the different parishes and parts of New Orleans; all elected by general ticket). There appears to be no law attempting to divide these parishes into districts.

By the constitution of Kentucky, its first constitution of 1792, article 1, section 4, provides for representatives elected by qualified electors of the counties respectively.

The second constitution of 1799, article 2, section 5, provides for elections by counties, provided that if a town has enough population for a representative it may elect its own.

The present constitution of 1850, article 2, section 5, expressly provides for legislative districts. The districting was done by the constitution, not by the legislature.

By the constitution of Maine, article 4, paragraph 1, towns elect from two to seven representatives, and towns not containing fifteen hundred population are classed together in districts, but no town shall be divided. The statute, as to elections (section 30), provides that if by reason of any persons having an equal number of votes a full choice of representatives is not elected, a new election shall be had, and the voters shall vote for so many candidates as are necessary to make up the number to which the town is entitled.

I find this in the Revised Statutes of 1883. It is obvious that the election in Maine is by general ticket.

In Iowa, representatives must reside in the county or district they are chosen to represent. Section 34 provides for senatorial apportionment of counties into districts, and that there shall be no division of counties in forming congressional, senatorial or representative districts, and that districts shall be formed of adjoining counties. No representative districts shall consist of more than four counties; that one-half ratio

gives a representative each one-half a representative, and that there shall be no change of county boundaries except on a popular vote.

The act of 1888, chapter CXCI., provides for ninety-five districts. Some counties are classed together, but five counties (Nos. 32, 44, 46, 48 and 70 in the list) elect two members each by general ticket.

Nebraska: "The legislature shall apportion the senators and representatives according to the number of inhabitants, excluding Indians not taxed, and soldiers and officers of the United States army and navy." *Const.* 1875, *art.* 3, § 2.

According to the above provision, the state was divided into districts, but each county was left with full representation in the assembly, no county being divided into districts, even when entitled to several representatives. *Pamph. L.* 1887, *ch.* V.

Oregon: Constitution of 1859, article 4, section 3 (*Rev.* 1887), provides for the election by electors of the respective counties or districts into which the state may be divided by law. Section 7 provides that no county shall be divided in making up senatorial districts. Division is authorized by this constitution. *Rev.* 1887.

North Carolina: By the constitution, article 2, sections 4 and 5, senate districts shall be arranged after every census, as near as may be of equal population and contiguous territory, and no county shall be divided unless entitled to two or more senators. Representatives are elected by the counties respectively, according to their population, but each county to have at least one.

The act of 1881, chapter CCXCI., apportions the representatives between the counties, but does not district. They seem to be elected by general ticket in the counties.

The act of 1883, chapter CCCCVII., appoints senatorial districts, sometimes classing counties together.

New Hampshire: Laws 1867, senators are elected by districts; no town divided. Representatives are elected by towns—small ones classed together and those having election

in town meeting.  Where a town elects more than one, it is obviously by general ticket.

Wisconsin has a constitution expressly providing for separate districts.

Virginia: Constitution of 1869, article 5, section 2, members of house of delegates are elected by the voters of the several counties and wards.  The senate are elected by districts.  The act as to election (page 77, section 58) gives various cities and counties from one to four delegates' each, but does not divide them.  They are certainly elected by general ticket.  The process of election (page 80, section 61) in case of vacancy being by a writ to the sheriff of the county or the sergeant of the corporation.  *Rev. Stat.* 1887.

Tennessee: By constitution, article 2, section 5, representatives are apportioned among the counties or districts, &c., provided that any county having two-thirds of a ratio shall have one member and that no county be divided.  In its Revised Laws of 1884, page 39, sections 114 to 117, we find the apportionment—two counties elect five each, eight counties elect two each, about thirty counties elect one each and some thirty-five counties are classed.  The election is thus by counties by general ticket, where more than one is to be elected.

In Vermont (Revised Laws of 1880) the counties elect two, three and four senators.  See page 80.  Each town elects an assemblyman.  See Constitution, page 36, sections 7 and 8.

On page 37 we find they are elected at the town meeting to represent the town.

Senators are apportioned to counties.  Article 23, page 48.  The senate shall be composed of thirty senators, to be freemen of the town for which they are elected respectively.  The senators shall be apportioned to the several counties according to population by the United States census, giving to each county at least one senator.  See page 80 and the amendment of 1850.

I find no districting of counties.

South Carolina: By the constitution of 1882, article 2, sec-

tion 4, the house of representatives consists of one hundred and twenty-four members, apportioned to the several counties according to the number of their inhabitants. By section 8 there is one senator for each county. The provision is very much like that of New Jersey. By the Revised Statutes, chapter 2, page 15, an apportionment is made. Twelve representatives are given to the larger and two to some of the counties. The legislatures have not attempted to district. See page 43, section 116. *Gen. Stat.* 1882.

In Minnesota, the constitution of 1886, article 4, gives full power to district.

In Mississippi, constitution of 1890, article 4, section 34, representatives are elected by the qualified voters, but express authority is given to district. *Stat.* 1892.

In Missouri there is likewise an express authority to district.

The evidence furnished by these constitutional provisions and the laws enacted thereunder is, of course, purely negative, but it assumes importance as indicating the prevalent belief, elsewhere than in New Jersey, of the implied inhibition on legislative bodies to do more than apportion the representatives among the several counties. The subdividing and districting of counties for the election of members of the general assembly seem to be practiced nowhere except in New Jersey, unless done by virtue of a special constitutional provision permitting the same.

In all my search I have been unable to find any state where districting has been done by the legislature without authority by the constitution; nor have there been any decisions authorizing any such action.

Constitutional provisions seem to be of four classes:

*First.* Those allowing elections by towns at town meeting by general ticket, including, principally, the New England states.

*Second.* Those allowing elections by counties by general ticket, including all the older constitutions of the middle and southern states.

*Third.* Those where counties or towns are grouped together

in districts, a course rendered necessary where the country is very sparsely settled.

*Fourth.* Those where, by express constitutional provision, election is by single districts.

In spite of the supposed popularity of this last plan, it does not include the greater number of the states, and there is no state in which it exists by mere legislative enactment without provision of the constitution.

We may go further and say that in every state in which it has been tried the process of this districting into artificial representative districts, whether by legislative commissions or supervisors, has been found so productive of the abuse usually termed "gerrymandering" that it is a threat to our free institutions.

In any event the districting of 1891 is void. It shows the dangers of the system. But even if the system were right, it is too outrageous to stand as to Essex county.

The districting of 1891 was not made according to population, neighborhood or contiguity of territory, ward lines or civil divisions. There is no idea of apportionment in population in it. It is an artificial anatomy of a living county hewn into *disjecta membra*. The eleventh district, with forty-two thousand population, is a rainbow around the whole county. The fourth district is a cross. The second district is a pan-handle going down by the river. It is a political device.

It is the same in some other parts of the state. Facts and figures are beyond dispute. In Camden there are ten thousand five hundred in one district and over sixty thousand in another. In Monmouth, part of one district is an island in the middle of another. There is no rule or reason in this districting except that of political device for the perpetuation of political power. It is said that the previous districting of 1871 and 1881 contained like devices, and this, so far as one district in the county of Hudson is concerned, must be admitted.

As was said by the court in the Michigan case :

" The time for plain speaking has arrived in relation to the outrageous practice of gerrymandering which has become so common, and has been so long indulged in without rebuke, that it threatens not only the peace of the people but the permanency of our free institutions.

" The courts alone in this respect can save the rights of the people and give to them a fair count and equality in representation.   It has been demonstrated that the people themselves cannot right this wrong.   They may change the political majority in the legislature, as they have often done, but the new majority proceeds at once to make an apportionment in the interest of its party as unequal and politically vicious as the one that it repeals.

" There is not an intelligent schoolboy but knows what is the motive of these legislative apportionments, and it is idle for the courts to excuse the action upon other grounds, or to keep silent as to the real reason, which is nothing more nor less than partisan advantage taken in defiance of the constitution, and in utter disregard of the rights of the citizen.

" *  *  *   It is time to stop it.   And the citizen has the right to appeal to the court in defence of his most sacred rights under the constitution.   He cannot be obliged to wait for prosecuting attorneys or the attorney-general.   It is as well a public as a private grievance, and the individual elector can invoke the aid of the court in his own behalf and call attention also to the existence of a great public wrong.

" There is no higher privilege granted to the citizen of a free country than the right of equal suffrage, and thereby to an equal representation in the making and administration of the laws of the land.   Under our state constitution the right of the elector is fixed.   To him equal representation is a right, as well as a privilege, of which the legislature cannot deprive him.   These wrongs have been committed for partisan purposes.   Their object and effect have been to deprive the majority of the people of their will in the administration of the government.

" The greatest danger to our free institutions lies to-day in this direction. By this system of gerrymandering, if permitted, a political party may control for years the government against the wishes, protests and votes of a majority of the people of the state, each legislature chosen by such means perpetuating its political power by like legislation from one apportionment to another.

" We have been obliged, under the issue here made, to investigate but two apportionments—those of 1891 and 1885. Both are tarred with the same stick. We do not care to go further, since there is a remedy in the hands of the executive and legislature. The consequences of this decision are not for us. It is our duty to declare the law, to point out the invasion of the constitution, and to forbid it."

If legal districting of Essex county has not been made in 1891, the election must be by general ticket.

This is true even if the legislature has power to district. The reason is that, in 1891, the legislature lawfully assigned to the county of Essex eleven members when it had ten before. It made other changes in the representation throughout the state. The assignment and apportionment of representatives to various counties was lawful under the constitution. If districting is likewise lawful, the districting made by that act is rightly made in the counties where it was fairly made. If this court declares that it was unfairly made in Essex, there is no previous districting to which the court can resort, because the number of members in Essex county has been changed. No division into eleven districts has been made in Essex county and the election must be by general ticket.

The decision in the Michigan Supreme Court was under a constitution expressly providing that where districts are created they shall contain approximately the same population, and decides that a legislative Districting act, which is against this provision of this constitution, plainly and upon its face, is void, and will be so declared by the courts.

We pass now, however, to the important decision of the highest court of the State of New York, that substantial

equality of population is an implied requirement wherever authority is given to district, although this be not expressed.

In New York the constitution of 1846 provided for such substantial equality, and in an amendment of 1874 this provision was omitted, and it was provided simply that the supervisors of the county, in making up the districts, should make them of contiguous territory, not dividing towns.

The court held, reversing the General Term, that, nevertheless, substantial equality in districts was essential to any scheme of representative government, and that where the district showed an entire disregard of consideration of population by putting three times as many people in one district as in the other, it would be declared void.

The opinion must be read as a whole, but no man can get away from the conclusions there stated.

For the defendants, *Frederic W. Stevens.*

*First.* The application is prematurely made. It is altogether problematical whether a certificate containing the names of candidates to be nominated on a county ticket will ever be presented to the clerk, and, if presented, what his action will be. The well-settled rule is that before this application can be made some omission of duty or refusal to act must be shown, and nothing of the sort appears here. *High Extr. Rem.,* § 12; *Magie* v. *Union,* 13 *Vroom* 531; *United States* v. *Elizabeth,* 3 *N. J. L. J.* 51; *State* v. *Governor,* 1 *Dutcher* 343.

*Second.* On the merits two points are made by the relators—(1) that the constitution does not allow a division of the county into districts for the election of members of assembly; (2) that if it does, it requires such division to be made in proportion to population.

As to the first point, it is enough to say that the matter, however interesting might have been its consideration at a former period, is no longer open for discussion.

In the first place, it is *res adjudicata* in this court. It was expressly decided in *Gardner* v. *Newark,* 11 *Vroom,* that it

was within the power of the legislature to divide the county into such districts as it saw fit. Then, again, we have the practical construction put upon our constitution for the last forty years, and we have, furthermore, the practical construction put upon the clause of the federal constitution couched in terms practically identical, providing for the election of congressmen by the people of the states, which clause has always been construed as allowing the election of congressmen by congressional districts. Lastly, we have the unanimous opinion of the Supreme Court of the United States, delivered by Chief Justice Fuller, in the late case of *McPherson* v. *Blacker*, 146 *U. S.* 1, in reference to the very analogous case of presidential electors. These considerations and cases put the matter beyond the possibility of doubt.

As to the second point, it is quite apparent that whether we consider the matter from the standpoint of the common law or from the standpoint of our constitution, there is no such principle of giving to the voter an equal voice in the choice of representative as is here contended for. At common law representatives were elected to parliament from the different towns, boroughs and counties without the slightest reference to the population they contained. Judge Story, speaking of the state of things that existed prior to the Reform act of 1832, says that of the five hundred and fifty-eight members, one-ninth were elected by three hundred and sixty-four persons, one-half by five thousand seven hundred and twenty-three persons, and the rest by constituencies averaging one member for about twenty-nine thousand of the inhabitants. *Story Const.*, § 661.

Under our own constitution of 1776, the legislature was untrammeled in this matter. It could constitute any kind of assembly district it chose. By the constitution of 1844 the legislature was curtailed in only one respect, and that was that after each census it was required to apportion the members of assembly "among the said counties as nearly as may be, according to the number of their inhabitants." In every

other respect the legislature, like its prototype, parliament, was and is omnipotent.

It is not therefore pretended that the legislature is expressly prohibited by our constitution from subdividing the county into such districts as it may see proper. But, it is said, the spirit of the constitution requires that the districts be so constituted as to give them an equal population and every voter an equal voice. The fact is, the spirit of our constitution is absolutely and in every direction opposed to giving an equal population to each constituency and equality of voice to the voter.

*First.* The senators are chosen from the counties without the slightest reference to equality of population. Cape May county has the same right to elect a senator that Essex county has.

*Second.* In the distribution of members of assembly, the constitution requires that each county, however small its population, shall be entitled to at least one member, and the total membership is limited to sixty.

*Third.* In the apportionment of members among the counties, the apportionment is to be " according to the number of inhabitants," not of voters. Included in the inhabitants are women, children and aliens or persons not naturalized. In some of the counties, like Hudson county, the number of these latter is large. And so the constitution itself renders it impossible to give to the voter an equal voice. Whenever the constitution speaks at all it speaks the language of inequality, and not equality. How absurd it is, then, to claim that the spirit of the constitution requires that the assembly districts be equally divided in point of voting power.

Now, a fundamental rule of constitutional construction is that the congress is a body of limited powers, from which what is not expressly given is withheld, but that the state legislatures are omnipotent—represent the sovereignty of the people—except in so far as they are restrained by express constitutional provisions.

Says Chief Justice Fuller, in *McPherson* v. *Blacker*, 146

*U. S.* 25 : " The legislative power is the supreme authority except as limited by the constitution of the state, and the sovereignty of the people is exercised through their representatives in the legislature unless, by the fundamental law, power is elsewhere reposed."

On this principle, is it not perfectly plain that, no limitation being imposed upon the power of the legislature to divide into districts, it can exercise that power in such manner as it sees fit? But it is said the legislature may and has, in fact, abused that power in its Apportionment act of 1891. If this be conceded it does not help the relators' case, because abuse of power does not render an act unconstitutional. The legislature might pass any number of bad laws—might even abolish the penal code. Still, if it acted within its recognized powers, the appeal would necessarily be to the people and not to the courts. A bad law is not an unconstitutional law. Hence, it is manifest that the injustice of the apportionment is no argument whatever against its constitutionality. The relators must go further and show not only that it is unjust, but that it comes into conflict with some clause in the constitution. But, as I have shown, the act in question comes in conflict neither with any express provision nor with any that can be implied from its spirit.

Besides, if the act of 1891 is unfair as to Essex county, the acts of 1881 and 1871 are equally unfair as to Hudson county. This is shown by defendants' table, taken in connection with the stipulation I have printed.

We would have to go back, then, to 1861, for the provisions of the Apportionment acts are not divisible. If void as to any county they are void as to every county. Under the Apportionment act of 1891 Essex county is entitled to eleven members. Under that of 1881, to ten. Strike from the act of 1891 the Essex county assembly districts, and you necessarily go back to the act of 1881 (assuming, for the moment, that it is constitutional), or to some prior act; but in the act of 1881 you find only ten assembly districts described. You are, then, in a dilemma. Under the census of 1891, Essex

county's constitutional quota of members is eleven. She is entitled to that much voting power in the assembly, if the assembly is to consist of sixty members. If she is to have only ten, then the representation of the other counties must, on the basis of any constitutional apportionment among the counties, be reduced. This demonstrates not only that the legislature would not have apportioned members to other counties on the basis adopted, allowing to Essex only ten members, but that it could not. Hence, it follows that the whole act must be adjudged void, for the invariable rule is that the act is held void *in toto* where the court is satisfied that the legislature would not have framed the other provisions of the law as they have framed them, were the unconstitutional provision to be expunged.

The suggestion that the eleventh member from Essex county might be elected on a general ticket is clearly inadmissible, because there is no law authorizing or making provision for such an election.

For the respondents, *Allan L. McDermott.*

The right of the legislature to divide the counties of the state into assembly districts has been exercised during a period of forty years and has been hitherto but once assailed. Under the constitution of 1776 the members of the general assembly were elected by the counties at large, section 3 directing that the counties should annually choose members of the legislative council of the colony and that "at the same time each county should choose three members of assembly." Under this provision it may have been that all the members of the assembly were to be chosen by the county at large. The direction was that they should be "elected by the county." At any rate, this plan was adopted, and until 1852 the members were so chosen. The constitution adopted in 1844 changed the provision to read: "The general assembly shall be composed of members annually elected by the legal voters of the counties respectively." In view of the fact that the wording of this

provision is nearly identical with that of the federal constitution, concerning the house of representatives, the court will find aid in an almost contemporaneous construction by congress of the provision in the national charter. Article 1, section 2, of the federal constitution provides: "The house of representatives shall be composed of members chosen every second year by the people of the several states; and the electors in each state shall have the qualifications requisite for electors of the most numerous branch of the state legislature." Applied to New Jersey, this is tantamount to saying that the house of representatives shall be composed of members elected by the legal voters of the state. It is highly improbable that the similarity of expression in the constitutions is the result of chance phraseology. What is meant by these words in the federal constitution had but recently been the subject of protracted and disputatious consideration in the halls of congress. When the reapportionment of the house of representatives was before the twenty-seventh congress, Mr. Halsted, a member from New Jersey, offered an amendment providing that in every case where a state is entitled to more than one representative, the number to which each state shall be entitled under this apportionment shall be elected by districts composed of contiguous territory, equal in number to the number of representatives to which said state shall be entitled, no one district electing more than one representative.

The amendment was bitterly opposed, involving, as it did, the relation of the federal government to the states—a question which was somewhat of a firebrand in those days. The "Congressional Globe" for that session evidences the interest taken in the bill. There were speeches on it in the senate by Benton, Calhoun, Buchanan, Silas Wright, Miller, of New Jersey, and many others; in the house by nearly all the leading members. See Cong. Globe, 27th Congress. The bill received the support of the New Jersey senators and representatives. The latter had been elected on a general ticket. Senator Miller, of this state, made a point which I take pleasure in repeating, in reply to the attacks which were made at

the argument of the motion for this rule, on this district system. He said: "The single district system will also put an end to all the petty contrivances—those caucus combinations —by which the unworthy candidates too frequently procure themselves to be placed upon a general ticket. We have all seen and felt the effects of this odious practice. Men who could not command a hundred votes when standing alone upon their own merits, have, with the aid of a few active and zealous personal friends, contrived to get themselves upon a party ticket along with more popular and worthy candidates, thus uniting the good with the bad, and then, by means of party discipline, riding triumphantly into power, against the honest wishes of the very people who vote for them; but if we elect by single districts, every candidate must stand or fall upon his own individual character. He can borrow no influence from his fellow-candidates, no support from combinations with others. He must fight upon his own hook, and therefore will not venture into the canvass unless he has merits to recommend him to the people of the district where he resides. This mode of election will also give to the people a more direct control over their representatives. At each returning election he must go back to his immediate constituency, meet them face to face and give an account of his stewardship. This individual accountability of the members will strengthen the confidence of the people in their representative, each operating upon and sustaining the other, giving additional efficiency to the laws and institutions of the country by bringing to their aid the confiding and hearty support of the people." *App. Cong. Globe* (27th Congress, 2d session), *p.* 790.

Mr. Colquitt, of Georgia, seems to have been the only representative who seriously contended that the federal constitution required an election of delegations by states at large. He was answered by several. Representative Davis, of Kentucky, so replying, said: "But what was the contemporaneous exposition of this point? How did the age and the people who framed the constitution understand the matter now mooted? Certainly that there was no principle to control it incorporated

in that instrument, but that it was a part of the 'manner of holding elections.' Accordingly, we find nearly all the states—all the large ones—adopting and continuing the district system from the ratification of the constitution to the present time. Some of the smaller states have alternated the two modes, whilst none but the younger states, and Rhode Island, Mississippi, Arkansas and Missouri have adhered uniformly to the general ticket. By the gentleman's argument there has not been a congress since the formation of the government in which there was more than a very small minority of this house constitutionally elected."

The bill was adopted and signed by President Tyler, but not until there had been a wrangle between the senate and house about the relation of apportionment. The question of the rights of the states, of the power of the federal government, was discussed for weeks, so that the attention of the whole country must have been brought to the debates. The amendment offered by Mr. Halsted was adopted. 5 *U. S. Stat. at L.* 491.

It will be seen that the direction to elect representatives by districts had but one condition—that " the districts be composed of contiguous territory." This single limitation continued until the reapportionment of 1872, when it was directed that the congressional districts should be " composed of contiguous territory, and containing as nearly as possible an equal number of inhabitants." *Rev. Stat. U. S., p.* 4. This direction was renewed in the reapportionment of 1891. *Rev. Stat. Sup., p.* 888. The proposition to elect representatives by districts, the debate on states' rights and other then vital questions, the result, all must have attracted the attention of the citizens of New Jersey, and particularly that of the twenty lawyers—of ex-Governors Dickerson, Williamson and Vroom, of Charles C. Stratton, who was a member of the house that passed the bill—and the construction put by congress upon the federal constitution must have been fresh in the memories of these gentlemen when they were called upon, two years later, to frame a new constitution for our state.

It had become the custom in some of the states to elect the entire state representation in the house of representatives on a general ticket, voted upon as a whole throughout the state, thus securing a solid delegation of one political faith. To break this custom, congress enacted that when a state was entitled to more than one member, the members should be elected by districts composed of contiguous territory. *Mill. Const., p.* 612.

When the statesmen who composed the convention of 1844 adopted the wording of the federal constitution, they did it in the light of recent construction, giving them noonday guidance, and it is almost ridiculous to say they intended the words " by the legal voters of the counties respectively " should preclude the subdivision of those counties into assembly districts, while the words " by the people of the several states " allowed an apportionment of congressional districts.

The people of the state continued to elect their assembly from counties at large until 1852, when, in his annual message, Governor Fort called attention to the necessity of creating assembly districts, saying: " In this connection, permit me to call your attention to the propriety of electing members of the general assembly by single districts. Legal provisions, dividing the several counties into as many districts as there are members of the assembly to be elected, would comport with the genius of our representative system, and effect a more direct responsibility of the representative to his constituents. He would better understand their views and wishes, and feel a stronger inducement to carry them out. The popular influence in that branch of the legislature would be increased by bringing the exercise of political power nearer the source whence it is derived."

The matter was referred to a committee of five members and two senators, and their labors resulted in the first apportionment of the assembly districts, which was approved March 26th, 1852. *Pamph. L., p.* 462.

There seems to have been a general demand for this scheme and pleasure at its enactment. No question as to the consti-

tutionality of the act appears to have been raised in either house of the legislature. On the final passage of the act in the senate the vote was fifteen ayes to four nays, and in the assembly thirty-eight ayes to eleven nays.

In his next annual message Governor Fort said: "I would particularly refer with much gratification to the act establishing the district system in the election of members of the general assembly, which, I am satisfied, has been generally approved."

The approval of the press seems to have been irrespective of party.

In reviewing the session the "True American" (Dem.) condemned most of its work, adding: "But, above all, we have one of the best laws ever passed by the legislature—that for the formation of single assembly districts. This is a sovereign balm, which almost reconciles us to every misfortune. By this means the people will be enabled to make better selections and legislators will be held more personally responsible to their constituents."

The "Paterson Guardian," politically opposed to a majority of the legislature, speaking of the district system, said, in its issue of March 10th, 1852:

"Each district, as will readily occur to every reader, is to elect one assemblyman, without any regard to the other districts into which the county is divided. The senator, of course, is to be elected by the united vote of the several districts, as he is the representative of the whole county, the same as has been the case. The district system in reference to assemblymen possesses advantages, in that each district will elect a man whom the electors of that district may be presumed to know, and the representative in turn, from his knowledge of the wants of the people he represents, will be more likely to truly and faithfully advocate their interest. It will also prevent one section of the county from foisting upon another a candidate or representative whom they may not know, and if known, who may be obnoxious. If the present Democratic legislature perform no more acceptable ser-

vice than properly to district the counties, they will have done not a little worthy of the approbation of their constituents."

I quote these journalistic opinions in answer to the claim that the old manner of electing by counties at large was entirely lovely in its result.

From 1852 until 1878 the assembly districts were legislated within counties, and the constitutionality and propriety of the enactments were unassailed, except in political debate. In 1878 the legislature disturbed the lines of many assembly districts as they were fixed by the Redistricting act of 1871, not reapportioning the allotment of members of assembly to the counties, but only changing the boundary lines. This redistricting scheme was reviewed by this court in the case of *Gardner* v. *Newark*, 11 *Vroom* 297, and I submit that, by the decision in that case, the question of whether there may constitutionally be an apportionment of assembly districts within county lines is, in this court, *res adjudicata.* The question was directly involved, directly considered and directly decided. If this is so, and I have been unable to find any objection to the proposition, there is very little for this court to consider. The legislature of 1891 was entitled to regard that decision and be guided by it.

"A solemn decision upon a point of law, arising in any given case, becomes authority in a like case, because it is the highest evidence that we can have of the law applicable to the subject, and the judges are bound to follow that decision so long as it stands unreversed, unless it can be shown that the law was misunderstood or misapplied in that particular case. If a decision has been made upon solemn argument and upon mature deliberation, the presumption is in favor of its correctness, and the community have a right to regard it as a just declaration or exposition of the law, and to regulate their actions and contracts by it. When a rule has once been deliberately adopted and declared, it ought not to be disturbed unless by a court of appeal or review, and never by the same court, except for very urgent reasons, and upon a clear manifestation of error." 1 *Kent Com.* 475.

If this is true of the relation of the doctrine of *res adjudicata* to private controversies, how much stronger is the application of the words when we are considering the right of legislative reliance upon judicial direction. Surely the judicial department will not to-day say to the legislative and executive departments, "You may so enact," and to-morrow, "You may not."

The question of apportionment of the assembly districts is a political one, not subject to judicial review.

The duty of reapportioning the members of assembly is commanded by the constitution. The history of section 3 of article 4 of that instrument, by which the duty is devolved, does not illumine the proposition that the framers of the constitution were in search of a scheme of equal representation. In the constitution adopted by the provincial congress, it was provided that "each county shall also choose three members of assembly," provided always that a majority of the legislature might alter the number from any county, " on the principles of more equal representation." The legislative council was composed, as the senate is now, of one member from each county. It was and is organized without regard to popular representation. The scheme of the council was continued in the constitution of 1844, so that the senate of this state is to-day composed of twenty-one members, the four of whom from Hudson, Essex, Passaic and Camden counties represent an aggregate population of seven hundred and twenty-three thousand and fifty-seven, or more than one-half of the population of the state, as found by the census of 1890. This misrepresentation in the smaller branch of the legislature is not founded upon any principle analogous to those which support the equal representation of states in the United States senate. Our senate and assembly are both popular, elected directly by the people, and the only reason why misrepresentation is found in the senate is because the framers of the constitution of 1844, a large majority of whom represented a minority of the people of the state, refused to submit the question to the electors. In the convention of 1844,

Mr. Condit, a delegate from Essex county, moved that his county, "on account of its large population," be entitled to two senators, which was defeated by a vote of forty-eight to four. The delegates from the small counties had a majority of votes, and, without other reasoning than that might makes right, the question of equal representation in the lawmaking power was withheld from the people, and such representation continued for the counties, as such, regardless of population. There may have been a spirit of fairness in that convention, yearning for equal representation, but it was very thoroughly subdued. The committee on legislative department, of which ex-Governor Vroom was chairman, reported the following section :

"The members of the general assembly shall be annually elected by the legal voters of the counties, respectively, and shall be apportioned among the said counties according to the number of their inhabitants, the present apportionment to continue until the next census of the United States shall have been taken, when the same shall be changed by the legislature, and shall remain unaltered until another census shall have been taken, provided that each county shall at all times be entitled to one member." See *Jour. Proc. Const. Con.,* p. 51.

This section, as thus reported, provided for equal representation, as the only ratio of population upon which apportionment could be made under its provisions would be the number of inhabitants of the least populous county, or less. If this had been adopted there would have been ground for crediting the gentlemen of 1844 with some regard for the shrine of equal representation at which the complainants would kneel in repentant spirit. As nearly as possible, this would have given equality of weight to the ballots of New Jersey's freemen when cast for members of assembly. But the convention was not intent on that result, and before the section reported by the committee was submitted to the people it was amended to read, "and the whole number of members shall never exceed sixty." The adoption of this

amendment put equal representation in the assembly out of question.

So we have it that the constitution does not provide for equality of representation in the senate nor for equality of representation in the house except as between those counties entitled to more than one member of assembly. The constitutional direction is therefore reducible to this, that, among those counties having more than the ratio of apportionment established by the census last taken, the number of members of assembly remaining after one has been awarded to each county having a population less than such ratio, shall be apportioned, "as nearly as may be, according to the number of their inhabitants." In view of this outcome of its labors, it is difficult to imagine that the convention of 1844 was much concerned about "equal representation." Such representation was adopted as a basis of distribution only after place had been made for provisions which guaranteed to a minority of the people of New Jersey a major representation in their legislature. The result has been, is and will continue to be that the laws of this state have and will be made by legislatures representing, aggregately, a minority of the people, notwithstanding the opposition of those representing the majority. The constitution of this state was, in its provisions for a legislature, formed on the lines of greed and grab, and the article conferring the right of suffrage did not give, and was not intended to give, equal force to voted expression.

I think, because of these facts, that we may safely assume that there is not any implied constitutional direction to the legislature to see that its successors are elected on lines of equal representation.

The only provision on this point is that expressed in article 4, section 3, that "the general assembly shall be composed of members annually elected by the legal voters of the counties, respectively, who shall be apportioned among the said counties, as nearly as may be, according to the number of their inhabitants." This was done by chapter 182 of the laws of 1891. The apportionment to the counties was cor-

rectly made, and is not, as I understand it, disputed. The complaint is that in the apportionment the lines of the assembly districts were not drawn with a proper regard for population. I submit that this objection cannot have any force in this forum. The power to divide the counties into election districts being found in the legislature, the exercise of that power is beyond judicial control. For its use or abuse the legislatures are responsible to the people. There is not any constitutional restriction upon the lawmaking power controlling or directing the subdivision of counties into assembly districts. The division may be fair or unfair, equal or unequal, proportionate or disproportionate, but if the legislature has the power to make any division, this court may not review the exercise of that power any more than the legislature could review and set aside the decisions of this court.

The third article of our state constitution defines the repositories of the powers of government, and the lines of demarcation cannot be disturbed by complaints made to one department against the doings, within its exclusive province, of another. The relators must show that the law they attack is violative of constitutional limitation. The moment they step beyond this line of attack they are on political ground, beyond the jurisdiction of this court. *Cooley Const. Lim.* (*6th ed.*) 200, 206 and cases cited.

In *People* v. *Rice,* 135 *N. Y.* 473, it was held that the work of the legislature in reapportioning, under a constitutional requirement that "each senate district shall contain, as near as may be, an equal number of inhabitants," could not be reviewed unless it appeared that the exercise of discretion had been plainly and grossly abused. But the right to review, even in the extreme case here suggested, would be upon the ground that a constitutional direction, governing the apportionment, had been disregarded. So, in *Giddings* v. *Blacker,* 52 *N. W. Rep.* 944, the act complained of was contrary to the Michigan constitution, which directs that "the senate districts shall be rearranged every ten years, according to an enumeration of inhabitants."

In *Parker* v. *State,* 32 *N. E. Rep.* 836, the act was set aside because the apportionment was not in accord with the constitutional direction that " senators and representatives shall, at the next session following each enumeration, be fixed by law and apportioned among the several counties according to the number of legal voters in each."

In *Wise* v. *Bigger,* 79 *Va.* 269, it was held that the " laying off and defining of the congressional districts is the exercise of a political and discretionary power of the legislature, for which they are answerable to the people, whose representatives they are."    In Parker *v.* State, cited by relators on the preliminary hearing in this case, it is said : " This would be literally true in the absence of some constitutional provision requiring the districts to be formed in some particular manner."

The moment that the court decides that the legislature has the right to divide counties into assembly districts, the relators are without a case.    In *Doyle* v. *Newark,* 5 *Vroom* 236, Judge Dalrimple said : " I cannot yield to the suggestion that this court ought not to give effect to the act because it is against public policy.    Of the policy of the act the legislature were the sole judges.    From their decision there is no appeal."

In *State* v. *Brannin,* 3 *Zab.* 494, Justice Elmer said : "Admitting that the taxation be double, and therefore unequal and unjust, the power of the court to interfere and declare it illegal, except in cases where it is also in violation of some provision of the constitution, does not seem clear. The authorities are against the exercise of the power, except where it contravenes some constitutional provision.    The legislature, from some cause, have applied a rule of taxation to banks different from that applied to other corporations. This taxation may be unequal, oppressive and unjust, but if so the remedy is not with this court.    The interest, wisdom and justice of the legislature, and its relations with its constituents, furnish the only security where there is no express contract against unjust and excessive taxation, as well as

against unwise legislation generally." *Providence Bank* v. *Billings,* 4 *Pet.* 563, and other cases cited.

The right existing to divide the territory of the counties into assembly districts, where is the constitutional direction that these districts shall contain an equal or approximately equal number of citizens or voters? Surely it is not found in the proposition that every qualified male citizen may vote,. which means nothing more than that he may vote for all officers to be elected, wholly or in part, by the ballots cast at the election precinct where he is entitled to vote. If the right of suffrage carries with it, by force of the constitution, a right to equal adjustment of relative weight of individual ballots, this court could be called upon to set aside all unequal municipal divisions, to be in constant supervision of the exercise of political powers by the legislative and executive departments of the state government. The rule in this case is really a direction to the legislature to acquaint this court with the power of enactment, and the answer is that the matter of arranging the assembly districts within county lines wholly pertains to the legislative and executive departments. The act which it is sought to set aside was passed by the legislature and approved by the governor. If they were empowered to do this, it was because the work was not inhibited by the constitution. If any law can be enacted dividing counties into assembly districts, it must be under an exercise of political rights inhering in the legislative department. The constitution does not expressly authorize or in any way prohibit these divisions. Not being forbidden, they may be made, and made within that discretion which is absolutely reposed in the legislature.

In *State of Georgia* v. *Stanton,* 6 *Wall.* 50, a bill in equity,. filed by the State of Georgia to prevent the carrying into effect of certain "reconstruction" acts, on the ground that such an execution would annul and totally abolish the existing state government of the state, and establish another and different one in its place, was dismissed. Justice Nelson, delivering the opinion of the court, said: "That the matters,.

both as stated in the body of the bill and in the prayers for relief, call for the judgment of the court upon political questions and upon rights, not of persons or property, but of a political character, will hardly be denied, for the rights for the protection of which our authority is invoked are the rights of sovereignty, of political jurisdiction, of government, of corporate existence as a state, with all its constitutional powers and privileges. No case of private rights or private property infringed, or in danger of actual or threatened infringement, is presented by the bill, in a judicial form, for the judgment of the court."

The force of the negative position in this argument must grow upon the court by a contemplation of the possible judgments, if the relators have presented a grievance entitled to judicial remedy. They ask that the act of 1891 be set aside because the districts are unconstitutionally arranged. But the act of 1891 cannot be set aside unless it violates the constitutional direction to apportion the members of assembly among the counties according to population. There is not any question that the apportionment to the counties was properly made, and that each county is entitled to the number of assemblymen awarded by the act. Essex county is given eleven members. It cannot be deprived of any of them. It was the duty of the legislature to award them, and the courts cannot take them away. The constitution forbids any such action. It provides that when the apportionment is made, according to the number of inhabitants, it "shall remain unaltered until another enumeration shall have been taken," so that, if the apportionment to the counties was proper, it cannot be set aside because of any defect in the creation of assembly districts.

The request that the court order the November election held under a previous apportionment is absurd. In the case of two of the counties, Burlington and Ocean, the county lines have been changed. The ratio of representation under the census of 1890 is twenty-four thousand and eighty. If we return to the apportionment of 1880 or any of its prede-

cessors, what will the ratio be? And what will become of equal representation? And who is to say what is the present population of the assembly districts as fixed by any previous legislation? And if no one can say, how will the court assume that those districts would give fairer representation?

The act cannot be set aside as to Essex county alone, for this would deprive that county of its representation in the assembly. The court cannot say that the members shall be elected in the counties at large if it is constitutional to sub-divide those counties. That would be legislation. The apportionment to the different counties under the census of 1890 must stand. The constitution directed and protects it. The subdivision of counties is a matter political, not for judicial review. Article 3 of our state constitution was proposed by Mr. Abraham Browning. He was a man of great wisdom in his day and generation.

However entertaining or instructive the discussion of this question may be, the fact remains that there is not any legal controversy before this court. The county clerk of Essex county is ruled to show cause why a *mandamus* should not be issued if, at some future day, he should refuse to do something which he may or may not be called upon or requested to do. The relators prevailing, what will be the form of command to the respondent? Surely not that he print any particular ballot, because there is none proposed. Besides, the duties of the county clerks, under the " Ballot Reform " law, are not wholly ministerial. If any objection is made to the printing of the tickets or ballots desired by the relators, the county clerk assumes a judicial position. He must "pass upon the validity of such objection unless an order shall be made in the matter by a court of competent jurisdiction." *Pamph. L.* 1890, *p.* 386. Section 45 provides that if the clerk of a county fails to properly print ballots, he may be compelled to correct his errors and omissions by an order of the judge of the Supreme Court holding that circuit. The presumption is that the clerk will do all things which are incumbent upon

him.    There is not any evidence that the respondent has failed to do any and all things.requested.

An application for a rule to show cause why a *mandamus* should not be awarded compelling the governor to issue a commission was denied " because there is no evidence before the court that a commission has been demanded by the applicant or that the governor has refused to issue it.    This fact should affirmatively appear as the foundation of the application."    *State* v. *Governor,* 1 *Dutcher* 345.

The act which the relators assail was passed in 1891, and the election of last November was held under its provisions. If there was any force in any of their contentions they should have made them before this day.    The assembly districts have been divided into polling precincts, having relation to the formation of such districts, elections have been held in which the relators undoubtedly participated, and they have been too negligent in presenting their complaint to make that complaint the basis of a general disturbance of the established order of selecting the members of assembly.

For the relators, *Cortlandt Parker* (in reply).

I think the court will agree with me that no more important question has engaged the courts of the State of New Jersey than this.

Article 2 of the constitution defines the elective right of every white male citizen.    He is entitled to vote for all officers that now are or hereafter may be elective by the people.

" Every male citizen of the United States, of the age of twenty-one years, who shall have been a resident of this state one year, and of the county in which he claims his vote five months next before the election, shall be entitled to vote for all officers that now are or hereafter may be elective by the people."

A right to vote for all officers to be elected from the county by the people ; not for one officer, but for all.    It is the grant of suffrage to you and to me and to every citizen.

And then comes another section : the general assembly is to be composed of members elected—by whom ? By legal voters here or there, in districts? No, but by "the legal voters of the counties respectively." The voters means all the voters, not a part of them. And the assemblymen are to be apportioned among the counties, not districted within the counties.

Read the section—

"The general assembly shall be composed of members annually elected by the legal voters of the counties respectively, who shall be apportioned among the said counties as nearly as may be according to the number of their inhabitants. The present apportionment shall continue until the next census of the United States shall have been taken, and an apportionment of members of the general assembly shall be made by the legislature at its first session after the next and every subsequent enumeration or census, and when made shall remain unaltered until another enumeration shall have been taken ; *provided,* that each county shall at all times be entitled to one member ; and the whole number of members shall never exceed sixty."

We find, then, that this section provides for members of assembly to be elected from each county (the only division known to the constitution, brushing away, as the old constitution did, members from cities and from boroughs, &c.), and enacting that all assemblymen should be elected annually "by the legal voters of the counties"—not, observe, "by legal voters of the counties," but "by the legal voters of the counties"—all of them. If the county had one representative, all the voters join in electing him. If eleven, all were intended to join in electing them. If not, it would not be true that the legal voters of the county elected. And all the legislature had to do with the matter was specified. They were to apportion among the counties according to population taken from the last census.

See also article 4, section 1, paragraph 2 :

"2. No person shall be a member of the senate who shall not have attained the age of thirty years, and have been a

-citizen and inhabitant of the state for four years, and of the county for which he shall be chosen one year, next before his election ; and no person shall be a member of the general assembly who shall not have attained the age of twenty-one years, and have been a citizen and inhabitant of the state for two years, and of the county for which he shall be chosen one year next before his election."

With these words, so forcible and so comprehensive, though so few, can we be told that the legislature can do differently ?

Members from the county, elected for the county, according to the early laws, as shown by Mr. Emery's valuable brief, representing a county ; by the legal voters of the county, by a right that the constitution says shall belong to every voter, can we be told that the legislature can institute a different system, and give a voter only the right to elect one member from, for and representing a district, only part of a county ?

There is a maxim, often applied, "*Expressio unius est exclusio alterius*"—the mention of one thing excludes every other thing. There is a double application of this maxim here. When the constitution says that the assembly should be elected by the voters of the counties, that meant by all of them, and it said in no other way shall they be elected. When it said that their number should be apportioned among the counties by the legislature, it excluded the legislature from any other participation in the constitution of the assembly than to make such an apportionment.

But further than this. *Ex natura rei,* the power to specify that assemblymen should be elected from a district cannot exist unless the constitution contains it. What is more essentially a constitutional matter, in contrast with a matter legislative, than the definition of how the legislature should be made up ? Did one ever hear of provisions how a legislature should be elected, except by and in the constitution ? What is constitutional in its nature, if defining how the houses of the legislature shall be made up and elected, is not ?

And is there not the widest difference between electing, though in districts for voting facilities, eleven members and

electing in each of these districts only one member? How does that member become a member for and representing the county?

We do not insist that the legislature cannot make districts for voting. That they may do. The unconstitutionality lies in directing that one member only should be voted for in each district, and he a resident of it. Whereas, the constitution says that all voters of the county shall join in electing the assemblymen, and as to residence it requires only that he shall be a "resident of the county." When the legislature says that only residents of the district shall vote for one member from the district, they set their foot upon the constitution. The members were always called representatives from the county. Is it true to say I am a representative from the county, except as a mere statement of where I live, if I am only voted for by a corner of the county?

I repeat, plainly the constitution meant that the assemblymen from each county should represent it. When a member is elected from a district he does not represent the county, but only the one district whose voters elected him. Electing him is no act of the voters of the county, only of the voters of the district.

The legislature, controlled by party, no matter which, usurps power—creates itself—robs each free white male citizen of the elective privilege to which the constitution says he is entitled, takes from him the power and privilege of participating in the choice of eleven men, and gives him only that of helping choose one.

I insist that the specification of the class of men who shall constitute a legislative assembly is constitutional—not legislative—work, and therefore saying that no voters of a county should help elect more than one man, instead of helping elect eleven, which is the result of the district system, is changing the constitution, a thing which no legislature can do without express power.

And this argument, from reason and principle, is strongly corroborated by the fact that in every other state that the dis-

trict system obtains, the constitution authorizes it in terms, and congress itself does not claim the power to establish the districting system in any state which refuses it.

My friends build on the fact that districts for congressional election were made by the states.  Judge Story calls attention to the fact that the states were expressly given power over the time, place and manner of election.  What "manner" included was the question before congress, and it was a very debatable question.

The opinion of the Supreme Court of the United States is cited against us.  There the question referred to electors, and the Chief Justice said the power of the states is supreme.  The districting was state work and not under the powers granted the United States by the constitution.

Let me illustrate the question as to assemblymen by the constitutional provision as to other officers.

The constitution, article 7, section 2, paragraph 7, provides that sheriffs and coroners shall be elected annually by the people of their respective counties at the annual elections for members of assembly.

Could the legislature make several districts and let the people of each elect one coroner?

Their jurisdiction comprises the whole county.  Why? Because of the language of the constitution adopting English law, which makes each of the coroners as much a man of the county as the sheriff is.  The language in case of coroners is that they should be elected by "the people" of their respective counties; that in relation to the assembly, that its members should be elected by "the legal voters of the county." Each provision calls for a county vote.

I cite, also, *Cooley Const. Lim.* (3d ed.), *ch.* XVII., *p.* 616.

He cites and is sustained by *Madison County* v. *People,* 58 *Ill.* 456 ; *Attorney-General* v. *Supervisors,* 11 *Mich.* 63 ; *People* v. *Maynard,* 15 *Id.* 463 ; *Lanning* v. *Carpenter,* 28 *N. Y.* 447 ; *Fort Dodge* v. *District,* 17 *Iowa* 85 ; *Foster* v. *Scarff,* **15** *Ohio* 532.

Where an act of the legislature impaired the constitutional right of suffrage possessed by any voters, it was held void.

It would be astonishing that, on a matter so clear, such usurpation, theft of privilege from the citizen and bad policy should not long ago have been declared void by the courts.

But if it were true, as argued here by our opponents, that party spirit on both sides in politics has, during this time, preferred the district system; that the gerrymander power has tempted every party to favor it, because each anticipates its turn in making it win its victory and majority, then all the more is it the grand privilege and duty of the bench to "control the madness of the people" when it thus overturns the constitution. But the bench cannot act of its own motion. It must wait for relators. And only when, as now, the gerrymander has become the dragon which the facile pencil of Gilbert Stuart delineated, devouring the right of suffrage belonging to every citizen, has the occasion arisen for judicial action.

In the name of patriotism, do not let this great opportunity slip for doing good and for giving a check to party chicanery on whatever side.

Do not say that long-continued wrong establishes right. This is true in real estate. But that is to bring about peace between individuals. Let the gerrymander go on from bad to worse, from worse to worst of all, and will peace be sustained? May not this rascality one day be the cause of popular resentment to the extent of actual conflict?

There is no statute of limitations here. Nor is it the practice of this court or of the Court of Errors to let unconstitutionality legalize itself.

Take the Agens case for an illustration. There, for many years, in all cities, the whole cost and expenses of improvements were assessed upon adjoining property, without regard to benefits conferred. The Court of Errors pronounced this unconstitutional and established a rule, the contrary of which had been well nigh canonized by time.

Again, there is another escape here from this great wrong presented by the blunder of the legislatures. The act of 1852

made one man to be elected in each district; the other acts, including 1891, leave out this provision. There is, then, no provision for the election of only one member by each district. So, only the constitution governs, and that says, as applying now, eleven members shall be elected by the voters of the county. Let the *mandamus* go, if even only on this ground, directing notice of the election of all the members, by voters in each district.

I am so clear that all electors should vote for all members in their county, that I have little time to discuss the districting laws. The reasoning in the Michigan case and the New York case supplies all wants. The reasoning of these judges cannot be overthrown, and no attempt here has been made to overthrow or meet it.

The New York case is found in 33 *N. E. Rep.* 287.

The Michigan case is on the brief.

The only argument for the policy of the district system (as if policy had aught to do with the question) is that the voter knows his man. But the gerrymander system robs the system of that argument, fallacious as it is.

Our opponents tell us that the legislature is supreme and can do all that Satan prompts, and that we must submit. And they say, going to my old friend, Senator Miller, and reading from his congress speech, that it is a strong argument for districts that the voter will know the district man and may not know the county man. But if this be so (and they spoke then without experience), what does the gerrymander do when it establishes a rainbow district all around the county? Such districting does not give the voter any more knowledge of the candidate.

I spend no time on the districting under which we were compelled to vote last year, and shall be this unless this court shall interfere. The argument as to its palpable chicanery and fraud is presented by the maps exhibited.

*First.* By the map of Essex county, of the districting of which we here complain. It shows gerrymandering, not constitutional, *bona fide* division of population by districts—

eleven thousand six hundred and forty-nine inhabitants in one district, forty-two thousand in another; the county vote giving fifteen hundred majority to the party, while eight out of the eleven members of the assembly elected belong to the opposing party.

*Second.* The defendants show maps of the state, and prove by them gerrymandering—that is, intentional fraud, seeking fraudulent majorities for the party now in power in every county—in one or two even more glaring than in Essex.

Study the maps and then read the opinions in the cases cited from Michigan and from New York. The maps do not show mistake nor human infirmity. They show unblushing wickedness.

And strangely, I think, our opponents do not deny this. They admit the charge of intentional arrangement for the purpose of attaining legislative majority. They have two defences—" *tu quoque* " and that the legislature has the power. And, they add, the question is not judicial, but political.

Alas! if it be so. It is our pride that in our land there is no wrong without a judicial remedy. Will this court say that such mischief cannot be corrected?

There is no such difficulty as suggested by Mr. McDermott's brief, as to what judgment should be rendered.

If districting be void, the nomination of assemblymen is a county nomination, to be voted for, canvassed and returned as such, in exactly the same way that coroners are now nominated, voted for and elected and returned. Our law provides fully the machinery for county elections by general ticket.

If, on the other hand, districting is lawful, but that for Essex is void, the same result follows. In that case there has been a lawful apportionment of eleven members to Essex county, but there has been no districting of that county into eleven districts, and the members must be elected by general ticket until such districting be made.

There is no previous districting that can be used. Wherefore, the constitution must govern.

If the court thinks a previous districting should stand, so

far as it goes, and the rest be elected on general ticket, there is an alternative prayer to that effect in our petitions.

And the districting can be held void as to Essex alone, notwithstanding the insistment of the defendants. That part of the act may be, as it is, unconstitutional, and the rest, referring to other counties, good.

It is argued that none of the officers to whom the *mandamus* is proposed to be directed, have refused to do what the relators wish them ordered to do, and therefore that the writ cannot be awarded. The answer is that, with the law before them, those officers have done otherwise in the year or years past, and thus given proof of their intention in the future—action on their part—equivalent to refusal. And, finally, the court will seek a remedy in any case when the right is so apparent and the wrong so flagrant.

On the assumption that to direct voting for one member for a district and the formation of districts for such voting is constitutional, one of the counsel of the defendants meets us squarely, and contends that the legislature can do as it pleases—that no matter what inequality it produces, and no matter what its motive of action, it is omnipotent. His argument is that inasmuch as the constitution directs that there should always be one member from a county, it rejects the idea of the districts being reasonably equal in population. Not so. It simply makes this exception—an exception not probable and barely possible to the rule of equality. Such an exception proves the rule.

Counsel again argues that in some counties the proportion of voters in the population is greater than in others. Did the constitution-makers anticipate any appreciable difference? And, in fact, is there any now existing? Has the court evidence of it? If it exist, will it continue? Could the framers of the constitution contemplate, much less meet, such exceptional cases?

Can counsel expect a court to hold a doctrine so insulting to the men who adopted our constitution, as that they meant that such inequality of representation as the district system

carries out and counsel uphold, might be carried out by the legislature? Can it be that they were so careful as to devote article 2 to the sole purpose of conferring and guarding the right of suffrage, and that they yet gave the legislature this full power to destroy its value and equality? Such a contention strengthens the argument in favor of denying the districting system at all.

But, again, the argument stands on the silence of the constitution as to districting. The complete answer is that the constitution having expressed its will as to how the assembly should be made up, and directed one mode of electing members and one act of apportionment, thereby did what counsel say it did not do. It "imposed limitation on the power to divide into districts," and by a well-established rule of construction forbade it.

The contention for the omnipotence of the legislature would prove too much. It is unreasonable, perhaps absurd, to claim this for New Jersey. The very motive for the convention and the constitution of 1844 was to annihilate this claim.

Counsel draws attention to the apportionment being "according to the number of inhabitants," not of voters. But while inhabitants, and not voters merely, are represented in the assembly, there is a proportion, well known, of voters to population, and equality to population will work out equality to voters. Besides, it is just as unfair and unconstitutional; in fact, it is the *gravamen* of our complaint that the districting system bestows greater representation on eleven thousand than on forty thousand people. It is the rights of all the people for which we contend.

The opinions of the judges in the cases cited from New York, Michigan and Wisconsin overthrow all these suggestions of the defendants' counsel.

We contend that the Districting act of 1891, so far as Essex is concerned, is unconstitutional and void. Counsel for the defendants say then the whole act is void. If so, what then? Return to voting by counties, or return to such a preceding act of districting apportionment as is valid, if any be.

The opinion of the court was delivered by

DEPUE, J.    The act of April 16th, 1846 (*R. S., p.* 409), entitled "An act to regulate elections," by its first section enacted that on the Tuesday next after the first Monday in November in each year an election shall be held *in each county* to elect *for such county* such a number of persons to be members of the general assembly as such county shall be entitled to elect.    The first act dividing counties into assembly districts was passed March 26th, 1852.    *Pamph. L., p.* 281. This act was a supplement to the act to regulate elections. The second section of that act enacted that on the day mentioned in the act of 1846 in each succeeding year an election should be held in each of the said assembly districts for one member of the general assembly, who "shall be a resident in said district."    In 1861, at the session of the legislature held next after the federal census of 1860, an act was passed which was also a supplement to the act regulating elections, forming the several counties into as many assembly districts as said counties were respectively entitled to members of assembly. *Pamph. L., p.* 529.    In 1871 a similar act was passed, with the title of "An act to reapportion the several assembly districts of the State of New Jersey."    *Pamph. L., p.* 45.    By the General Election law of 1876 the first section of the General Election act of 1846 was amended by requiring an election to be held in the several election districts in each county to elect for such county such a number of persons to be members of the general assembly as such county shall be entitled to elect.    *Rev., p.* 337.    Supplements to the Apportionment act of 1871 were passed March 4th, 1878 (*Pamph. L., pp.* 40, 542); March 6th, 1878 (*Id., p.* 49); March 12th, 1878 (*Id., p.* 81); March 29th, 1878 (*Id., p.* 570); April 3d, 1878 (*Id., p.* 266); April 4th, 1878 (*Id., p.* 285); April 4th, 1878 (*Id., p.* 287); March 27th, 1889 (*Id., p.* 115).    Of these acts all, with the exception of the act of April 3d, 1878, were alterations in several of the counties of the assembly districts established by the act of 1871; and the act of April

3d, 1878, appears to be a general act reconstructing the assembly districts in the state. In 1881 a general act was passed apportioning members of the assembly to the several counties in conformity with the federal census of 1880, and creating new assembly districts in each of the counties. *Pamph. L., p.* 146. In 1891 another general act was passed making a new apportionment of members of assembly among the several counties in conformity with the census of 1890, creating new assembly districts in each of the counties. *Pamph. L., p.* 339. By several acts, passed respectively March 7th, 1892 (*Id., p.* 652); March 23d, 1892 (*Id., p.* 180); March 24th, 1892 (*Id., p.* 251), which were supplements of the general act of 1891, alterations were made in the assembly districts of the counties of Mercer, Cumberland and Burlington. None of this legislation after the act of 1852 contained an express provision for the election of one member of the assembly in each assembly district. But the second section of the act of 1852 has not been repealed, and that section expressly provided for the election of one member in each of the districts. The contention in behalf of the relators that although assembly districts are established, there is no law in existence which purports to confer the right to elect members of the assembly otherwise than by the counties respectively, is without substance.

The question, therefore, arises directly in this proceeding whether the act of 1891 prescribes a constitutional method of electing members of the general assembly. The consideration arising *in limine* concerns the right and power of the judiciary to take cognizance of the subject. The contention of counsel, in resisting the allowance of this writ, is that the question is a political question and not subject to judicial review. The constitution delegates to the legislative department of the government the function of providing for the election of members of the assembly in the manner and subject to the restrictions prescribed by the constitution. A statute in the performance of that function is the exercise of a legislative and not of a

political power, and the constitutionality of the act by which that legislative power is exercised is a subject of judicial inquiry. *State* v. *Cunningham*, 51 *N. W. Rep.* 725 ; *Parker* v. *State*, 32 *N. E. Rep.* 836. The prosecutors who apply for this writ are citizens and legal voters in the county of Essex. The *gravamen* of their complaint is that, by the operation of the act of 1891, they are restricted in the exercise of the elective franchise in as full a manner as by the constitution they are entitled to enjoy it. The interest the relators have in the subject-matter of this controversy is sufficient to give them a standing in court to prosecute this writ. If the writ be allowed, its mandate will be directed not to members of the legislature, but to subordinate officers whose duties in connection with elections are purely ministerial. Recent decisions have furnished weighty precedents affirming the jurisdiction of the courts on the prosecution of citizens and voters over the constitutionality of acts of the legislature, making apportionments for the election of its members. *State* v. *Cunningham, supra; Giddings* v. *Blacker*, 52 *N. W. Rep.* 944; *Parker* v. *State, supra.* In *United States* v. *Ballin*, 144 *U. S.* 1, the court entertained jurisdiction to pass upon the validity of a rule of the house of representatives for determining the presence of a quorum to transact business. In *McPherson* v. *Blacker*, 146 *U. S.* 1, the same court entertained jurisdiction to consider whether a statute of the State of Michigan, providing for the choice of presidential electors, was in contravention of the constitution. On the argument, counsel directly made the point that the controversy was not judicial because whatever decision that court or any other court might make as to the validity of the state law was subject to review by other political officers and agencies. To this argument Chief Justice Fuller, in delivering the opinion of the court, responded in this language: "It is argued that the subject-matter of the controversy is not of judicial cognizance, because it is said that all questions connected with the election of a presidential elector are political in their nature,

that the court has no power finally to dispose of them, and that its decision would be subject to review by political officers and agencies, as the state board of canvassers, the legislature in joint convention, and the governor, or, finally, the congress. * * * The question of the validity of this act as presented to us by the record is a judicial question, and we cannot decline the exercise of our jurisdiction upon the inadmissible suggestion that action might be taken by political agencies in disregard of the judgment of the highest tribunal of the state as revised by our own." In State *v.* Cunningham, Giddings *v.* Blacker and McPherson *v.* Blacker, the writs prayed for were to go to the secretary of state, commanding him to perform the ministerial duty of giving notice that, at the next general election, electors would be chosen in a certain manner.

By statute, the city and township clerks are to give public notice of the time and place and purpose of holding an election (*Rev.,* p. 338, § 9), and, by the Ballot Reform act of 1890, it is made the duty of the clerk of the county to receive nominations and provide official ballots for the election of members of the assembly. *Pamph. L.,* p. 361. The prayer of the petitioners is for a *mandamus* directed to these officers, in the alternative either to give notice, receive nominations, prepare ballots for the election of the number of members of assembly apportioned to the county of Essex by the whole body of the legal voters of the county, or to receive nominations, prepare ballots and give notice of an election of such members, in accordance with the assembly districts created by the act of 1881.

The map marked *Exhibit R* 12 shows the territorial location and extent of the assembly districts created by the act of 1891. The following table, compiled from the testimony, exhibits the population of these districts respectively and also the number of votes polled in each district at the election of 1892 and the majority of the member elected in each district:

| DISTRICT. | POPULATION. | VOTE—1892. | MAJORITY. DEM. | MAJORITY. REP. |
|---|---|---|---|---|
| First | 18,616 | 3,381 | 521 | |
| Second | 14,897 | 3,634 | 310 | |
| Third | 11,349 | 3,209 | 587 | |
| Fourth | 17,746 | 4,662 | 596 | |
| Fifth | 27,431 | 6,750 | | 1,334 |
| Sixth | 15,245 | 3,298 | 648 | |
| Seventh | 29,748 | 6,691 | 239 | |
| Eighth | 25,600 | 5,137 | 119 | |
| Ninth | 24,872 | 6,386 | | 2,130 |
| Tenth | 28,172 | 6,454 | 751 | |
| Eleventh | 42,412 | 9,980 | | 1,623 |
| | | | 3,771 | 5,087 |

In this construction of districts, the eleventh district, with a population of forty-two thousand four hundred and twelve, and nine thousand nine hundred and eighty qualified voters, is allowed one member of assembly, and the third district, with a population of eleven thousand three hundred and forty-nine, and three thousand two hundred and nine voters, obtains an equal representation in the popular branch of the legislature. A qualified voter of the county of Essex, who casts his ballot in the third district, has, by this act, an effect given to it equal to the ballots of three qualified voters of the county cast in the eleventh district. The inequality in the apportionment of the population and qualified voters of the county among the districts by this act is conspicuous.

By the census of 1880, Essex county was entitled to ten members of assembly. The Apportionment act of 1881 created ten districts, having a population ranging from eighteen thousand six hundred and eighty-three to twenty-one thousand two hundred and fifty-three. The contention of the relators is that the apportionment among the several assembly districts by the act of 1881 was fair and reasonable, and that the apportionment by the act of 1891 is unjust and unreasonable, depriving the citizens of the county of the right of equal suffrage secured by the constitution. Hence, the alternative prayer of the petitioners is that a writ issue for an

election of ten members of the assembly in the districts formed by the act of 1881 and of one member by the county at large.

We find insuperable obstacles in the way of judicial action of the scope last mentioned. If the legislature, having made an apportionment of members among the counties in conformity with the constitution, has the additional power to create districts within the county for the election of members, its power in that respect is unfettered by constitutional limitation, and consequently beyond the control of the judicial department of the government. The legislature may create new counties. The creation of a new county adds an additional member to the state senate. The power of creating new counties may be resorted to for political or other purposes inconsistent with public welfare, and may be oppressive to taxpayers on whom the burden of supporting a county government may fall, and yet no one would entertain the thought that the remedy for such an unwise or oppressive act vested in the judiciary. The cases in which the courts have intervened to set aside acts of the legislature creating election districts, have uniformly gone upon constitutional limitations which had been violated. I know of no precedent or principle that would authorize the court to overturn a law passed by the legislature within constitutional limitations, on the ground that it is unwise, impolitic, unjust or oppressive, or even that it was procured by corrupt means. The remedy for legislation that is simply pernicious in its character is with the people. I concur in the views submitted by defendants' counsel in their brief that " the relators must show that the law they attack is a violation of constitutional limitations; the moment they step beyond that line of attack they are on political ground beyond the jurisdiction of the court."

The issue, therefore, presented by the record in this case is whether, under the government established by the constitution, the members of the general assembly apportioned among the several counties may be elected otherwise than by the qualified voters of the county at large.

The constitutional provisions under consideration are contained in article 4, sections 1, 2 and 3, under the title of "Legislature," and article 2, under the title of "Right of Suffrage."

Paragraph 1 of section 1, article 4, provides that "the legislative power shall be vested in a senate and general assembly." Section 2 provides that "the senate shall be composed of one senator from each county in the state, *elected by the legal voters of the counties respectively*, for three years." Section 3 provides that "the general assembly shall be composed of members annually *elected by the legal voters of the counties respectively*, who shall be apportioned *among the said counties* as nearly as may be according to the number of their inhabitants. The present apportionment shall continue until the next census of the United States shall have been taken, and an apportionment of members of the general assembly shall be made by the legislature at its first session after the next and every subsequent enumeration or census, and when made shall remain unaltered until another enumeration shall have been taken ; *provided,* that each county shall at all times be entitled to one member, and the whole number of members shall never exceed sixty." Paragraph 2 of article 4 provides that "no person shall be a member of the senate who shall not have attained the age of thirty years, and have been a citizen and inhabitant of the state for four years, and *of the county for which he shall be chosen one year*, next before his election ; and no person shall be a member of the general assembly who shall not have attained the age of twenty-one years, and have been a citizen and inhabitant of the state for two years, and of *the county for which he shall be chosen,* one year next before his election." Article 2, in providing for the right of suffrage, provides that "every male citizen of the United States, of the age of twenty-one years, who shall have been a resident of this state one year, and of the county in which he claims his vote five months next before the election, shall be entitled to vote for all officers that now are or hereafter may be elective by the people."

In construing these constitutional provisions, the form of government antecedent to the adoption of the constitution, the manner in which the legislative department was organized and the mode of electing its members, are important adjuncts in ascertaining the intent of the framers of the constitution.

By the instructions to Lord Cornbury and his commission, the instruments which in 1702 established a colonial government, a general assembly for the enacting of laws was constituted, consisting of twenty-four representatives to be chosen in manner following: Two by the inhabitants and householders in each of the towns of Perth Amboy, Burlington and Salem, ten by the freeholders of East Jersey, and ten by the freeholders of West Jersey. The qualification for the representatives of these divisions was an estate of freehold in " the division *for which he should be chosen,*" and the general assembly was composed of persons " *elected by the major part of the freeholders of the respective counties and places.*" *Leam. & Spi.* 619, 647. By an act passed April 4th, 1709, entitled "An act regulating the qualification of representatives to serve as general assembly in this province of New Jersey," two representatives were assigned to the towns of Perth Amboy and Burlington respectively, and two to each of the counties into which the colony was divided. This act provided that these representatives should be chosen " *by the majority of voices or votes of the freeholders of each county,*" and that the " *representatives for the counties aforesaid*" should be freeholders in that division " *for which he or they should be chosen.*" *Allin. L., p.* 6. As new counties were created from time to time each county was given two representatives, to be chosen by the county for representatives of the county.

By the first constitution of this state, adopted July 3d, 1776, the legislative department was divided into two bodies— a legislative council and a general assembly—the members of which were chosen annually, one member of the legislative council and three members of assembly being chosen by each county. The language of that constitution is that " the counties shall severally choose one person to be a member of the

legislative council," and "each county shall also choose three members of assembly." The qualification prescribed for the members of both the legislative bodies were, the member of the legislative council should be and have been, for one whole year next before the election, "an inhabitant and freeholder in the county in which he is chosen," and that no person should be entitled to a seat in the assembly unless he be and have been, for one whole year next before the election, an inhabitant of the county he is to represent." The right of suffrage was provided for in these words : "All inhabitants of this colony, of full age, who are worth fifty pounds proclamation money, clear estate in the same, and have resided within the county in which they claim a vote, for twelve months immediately preceding the election, shall be entitled to vote for *representatives in council and assembly, and also for all other public officers that shall be elected by the people of the county at large.*"

The constitution of 1776 authorized the legislature to add to or diminish the number or proportion of the members of assembly for any county or counties, as it might judge equitable and proper, on the principles of more equal representation. From time to time acts were passed increasing or diminishing the number of members of assembly in several of the counties. But no effort was made to equalize representation on the basis of population until 1838, when an act was passed, entitled "An act to provide for the equal and just representation of the several counties in this state in the general assembly," which enacted "that after the next and each subsequent census of this state that shall be taken in pursuance of any law or laws of the congress of the United States, *each county* of this state shall be entitled to elect and send to the general assembly one member for every six thousand inhabitants which such county shall contain at the time of taking such census, as near as may be; *provided always,* that no county shall have a less number of representatives than such county is now by law entitled to elect and send to the general assembly." *Pamph. L., p.* 57. This act was in force when the

constitution of 1844 was adopted, and the apportionment of members among the counties therein contained was by the constitution continued until the federal census next thereafter should be taken.

In all the legislation on this subject during colonial times, and in the constitution of 1776 and the legislation thereafter, antecedent to the convention which framed the present constitution, members of the popular branch of the legislature were regarded as representatives of the counties, chosen by the legal voters of the counties and qualified for the office by qualifications, having relation to the counties for which they were elected.

In the convention of 1844 the inequality of representation in the legislature was made the ground of serious complaint. As the result of the deliberations of that body, the equal representation of the several counties in the senate was retained, and equality of representation in the general assembly was provided for by the apportionment of members among the counties according to population. A comparison of the language of the old constitution and the constitution framed by the convention indicates that the purpose of the members of the convention was a modification in some particulars and not a radical change in the composition and selection of members of the legislative department. The old constitution provided that "each county shall choose" the members of assembly and that each qualified voter resident within the county should be entitled to vote for representatives in the assembly. The new constitution provides that the members of the general assembly shall be elected "by the legal voters of the counties respectively." The old constitution provided that no person should be entitled to a seat in the assembly unless he be and have been for one whole year next before the election an inhabitant of "the county he is to represent." The new constitution provides that no person shall be a member of the general assembly who shall not have * * * been a citizen and inhabitant * * * of the county for which he shall be chosen one year next before his election. In providing for

the ratio of representation among the counties, the method of apportionment adopted in the new constitution was, in principle, in conformity with the act of 1838, which regulated the subject under the old constitution. Between the old constitution, with the provisions of the act of 1838 engrafted upon it, and the new constitution there is a similarity of language and expression that indicates that the framers of the latter intended no change in the representative character of members of the general assembly or in the mode of their election. In recasting the section in the old constitution providing for the right of suffrage, the words "for representatives in council and assembly" were omitted. The new constitution having, in the section relating specifically to the election of these officers, expressly provided that senators and members of assembly should be elected "by the legal voters of the county," the omitted words were superfluous. And for the words "for all other public officers that shall be elected by the people of the county at large," the new constitution substituted the expression "shall be entitled to vote for all officers that now are or hereafter may be elective by the people"—an expression which includes officers elected in townships, wards and minor election districts as well as those officers who, by force of constitutional prescriptions, were made elective by the people, such as governor, senators, members of assembly, county clerks, surrogates, sheriffs, coroners and justices of the peace, accordingly as these constitutional officers were, by the constitution, made elective by the people of the state or by the legal voters of the counties or by the people of the several townships.

The problem the members of the constitutional convention were dealing with was the equalization of representation in the popular branch of the legislature. The old constitution permitted the legislature in its discretion to add to or diminish the number or proportion of members of the assembly for the several counties. This discretionary power in the legislature was discarded in the new constitution, and the apportionment of members among the counties in proportion to population

was substituted.   In a popular government representation in proportion to population extending over the area of a state is practically equivalent to representation on the basis of the number of qualified voters.   A computation on either basis would in the main reach nearly the same result.   And it is inconceivable that the distinguished body of men who composed the constitutional convention should have contemplated an apportionment of members within the several counties by means of assembly districts, not in proportion to population or under any other restriction, which should give to one qualified voter a voice in the election of members of the assembly equal to that of three or any indefinite number of voters who exercise their elective franchise at another voting place within the same county.   For, as has been said, if the power to create these districts is possessed by the legislature, it is a power beyond constitutional restraints.

The provisions of the federal constitution regulating the choice of presidential electors and the election of members of congress are not apt precedents for the construction of the provisions of our constitution for the election of senators and members of assembly.   Paragraph 2 of section 1 of article 2 of the federal constitution provides that "each state shall appoint, in such manner as the legislature thereof may direct, a number of electors [to vote for president and vice-president] equal to the whole number of senators and representatives in congress."   The appointment of electors is left with the several states, to be exercised in such manner as the legislature may direct.   Under this constitutional provision the legislatures of the several states have exclusive power to direct the manner in which presidential electors shall be appointed, whether by the legislature directly, or by popular vote in districts, or by general ticket.   *McPherson* v. *Blacker*, 146 *U. S.* 1.   In delivering the opinion of the court in the case last cited, Chief Justice Fuller said : "The constitution does not provide that the appointment of electors shall be by popular vote, nor that the electors shall be voted for upon a general ticket, nor that the majority of those who exercise the elective

franchise can alone choose the electors.    It recognizes that the people act through their representatives in the legislature, and *leaves it to the legislature exclusively to define the method of effecting the object."*

The provisions in the federal constitution for the election of members of congress are also expressed in general terms. Section 2 of article 1 provides that " the house of representatives shall be composed of members chosen every second year by the people of the several states, and the electors in each state shall have the qualifications requisite for electors of the most numerous branch of the state legislature." And by section 4, " the times, places and manner of holding elections for senators and representatives shall be prescribed in each state by the legislature thereof; but the congress may at any time by a law make or alter such regulation, except as to the places of choosing senators." In the absence of the interposition of congress, the manner of electing representatives in congress is committed to the state legislature, with no other restriction than with respect to the qualifications of the electors. At the second session of the twenty-seventh congress an act was passed for the election of representatives in congress by districts. The debate upon the act was long and earnest. Two representatives of this state, Senator Miller, and Mr. Halsted in the house of representatives, participated in that debate. This discussion occurred in June, 1842. The constitutional convention assembled in May, 1844. The article of our constitution relating to the election of senators and members of the general assembly was reported by ex-Governor Vroom, than whom no one was more familiar with public affairs, state and national. If the convention which framed our constitution intended to adopt a mode of electing members of assembly in conformity with the election of members of congress under the federal constitution, it is reasonable to assume that, with the discussions in congress at the session of 1842 fresh in the minds of its members, the provisions of our constitution on that subject would have been cast in language of similar import with the federal constitution; and it

is a significant circumstance that the language of the federal constitution which conferred discretionary power on congress, was avoided; the discretionary power possessed by the legislature under the old constitution was taken away, and a fixed rule was adopted that the members of the general assembly should be apportioned among the counties in proportion to population, and be elected by the legal voters of the counties respectively.

Grouping together the phrases in which the intent of the constitution is expressed, I think its true construction is beyond controversy. Members of the general assembly are apportioned *among the counties,* the qualification for member-· ship consists of *citizenship of the county for which they shall be chosen,* and they are to be *elected by the legal voters of the county.* The right of suffrage is granted to residents of the county, and each qualified voter is secured by constitutional prescription the right to vote for all officers elective by the people. Members of the general assembly are, by the constitutional regulation, elective by the legal voters of the counties, and every qualified voter who has for the specified period of time been a resident of the county in which he claims his right to vote is secured the right to a voice in the election of all officers which, by the constitution or otherwise, are elective by the class of legal voters to which he belongs. The constituency by which members of the general assembly shall be elected is designated by the constitution, and the qualifications requisite for the right of suffrage are therein prescribed, and also the elective franchise which shall be enjoyed by each qualified voter. These constitutional provisions were self-executing and also self-sustaining. *North Ward National Bank* v. *Newark,* 10 *Vroom* 380, 387, 388; *S. C.,* 11 *Id.* 558. Nothing was left for legislative action except the apportionment of members among the counties in a fixed ratio and such regulations as were necessary for holding elections—the canvassing of the votes and the certification of the result. When the legislature has once made an apportionment of members to any county, the constituency by which the members so

apportioned shall be elected, and the elective franchise of each of the legal voters by whom such members are elective, become subject to constitutional prescriptions which are beyond legislative control. The first Apportionment act under the constitution apportioned the members among the counties without making any provision for the manner in which they should be elected. *Pamph. L.* 1851, *p.* 289. This act was not imperfect. Without legislative aid, the mode of electing the members apportioned by the act among the counties was completely provided for by the constitution, which, *ex proprio vigore*, determines how members apportioned among the counties should be elected.

Other constitutional provisions which provide for the election of other officers, shed a light on the subject under consideration. Paragraph 7, section 2, article 7, provides that coroners shall be elected by the people of their respective counties. Paragraph 1, section 7, article 6, provides that there may be elected two, and not more than five, justices of the peace in each of the townships of the several counties, and in each of the wards in cities that vote in wards, the number of justices of the peace a township or ward may have being determined by its population. Paragraph 8, section 2, article 7, provides that justices of the peace shall be elected by ballot at the annual town meetings of the townships and of the wards, and when elected they shall be commissioned for the county. In these provisions, as in that providing for the election of members of assembly, the constitution prescribes the constituency by which coroners and justices of the peace shall be elected; and it could not be contended with any plausibility that an act of the legislature for the election of coroners in election districts, or for the election of the number of justices of the peace a township or ward is entitled to have in a corresponding number of election precincts, would comply with the constitutional mandate. It will be observed also that throughout the constitution the constituency by which every constitutional officer shall be chosen is defined with precision.

After a careful examination and the most attentive consideration of the important questions presented in this case, with the aid of the learned argument and elaborate briefs of counsel, in my judgment the election of members of assembly in assembly districts is a plain departure from the method of electing these representatives prescribed by the constitution. Instead of the eleven members apportioned to the county being elected by the legal voters of the county, one member is elected in each assembly district by the legal voters of that district arbitrarily created by the legislature. In the construction of statutes, it is a cardinal rule which applies as well to constitutional provisions, that when the law is in the affirmative, that a thing shall be done by certain persons or in a certain manner, this affirmative matter contains a negative that it shall not be done by other persons or in another manner, upon the maxim, *"Expressio unius est exclusio alterius."* 1 *Plowd.* 206, 207; 9 *Bac. Abr.* 235; *Sedgw. Stat. Const.* 30. Where the constitution prescribes the manner in which an officer shall be appointed or elected, the constitutional prescription is exclusive, and it is not competent for the legislature to provide any other mode of obtaining or holding the office. *Cooley Const. Lim.* 78, *note* 3; *People* v. *Albertson,* 55 *N. Y.* 50, 56; *People* v. *Bull,* 46 *Id.* 57, 63; 19 *Am. & Eng. Encycl. L.* 416, *tit.* "*Public Officers."* The election of one member in one assembly district and one member in another district, and so on through the eleven districts into which the county is divided, is not the election of the members of the general assembly apportioned among the counties by the legal voters of the county. The constituency devised by the system of assembly districts is another and a different constituency from that prescribed by the constitution; and the qualified voters of the county are restricted in the exercise of the right of suffrage as fully as is guaranteed to them by the constitution. It seems to me that it cannot be affirmed on any defensible ground that a member of assembly chosen by the voters of an election district within the county is, in the words of the constitution, "elected by the

legal voters of the county." An act of the legislature providing that each qualified voter of the county should vote for only one of the members apportioned to the county, would be plainly unconstitutional. The assembly district system differs only in form. It segregates the qualified voters of the county into classes and allows each qualified voter of the class to vote for only one of the members apportioned to the county.

It is contended, in the first place, that the constitutionality of legislation for the election of members of the general assembly in assembly districts is *res adjudicata.* To sustain this contention, *Gardner* v. *Newark,* 11 *Vroom* 297, was cited. The proceeding in that case was an application for a *mandamus* to compel the mayor and common council of the city of Newark to divide the city into wards corresponding in number and boundaries with the assembly districts created by the act of April 5th, 1878. The application was denied on the ground that acts creating legislative districts were public acts, and did not go into operation until the 4th of July succeeding the time they were passed. The case was argued at June Term, 1878, and prior to the date when the act of April 5th, 1878, became effective. It appears by the brief of the counsel of the relator in that case that the power of the legislature to divide counties into assembly districts was not put in dispute. His contention was that this power could be exercised only at the time the apportionment of members among the counties was made—that is, at the session next after the federal census—and that the districts then formed must remain unaltered until the time arrived for the next apportionment. It was to the aspect in which the question was presented by counsel that the remarks of Mr. Justice Reed with respect to the unfettered power of the legislature to direct the method in which members apportioned among the counties should be elected, were directed. The case was decided on other grounds. In June Term, 1890, the constitutionality of the assembly districting acts was mooted before the Court of Errors and Appeals in *Mortland* v. *Christian,* 23 *Vroom* 521. In that case the proceeding was in *quo*

*warranto,* to test the defendant's title to the office of chosen freeholder, under an election pursuant to an act of the legislature which provided for the election of chosen freeholders in assembly districts. In this case, as well as in Gardner *v.* Newark, the constitutionality of acts creating assembly districts arose collaterally. The title of the defendant to the office under such an election was sustained. But Mr. Justice Garrison, in delivering the opinion of the court, used this language: "Referring to the suggestion made on the argument, that the assembly districts which, by this act, are referred to as the precincts for the election of freeholders, were not legal legislative creations, inasmuch as the constitution contains no intimation but that members of assembly shall be chosen by the counties at large, it is sufficient to say that we are not now concerned with the legality of such subdivisions of counties. The act under review refers to these districts for the purpose of defining a territorial limit. Such precincts or assembly districts do exist, whether legally or not, and to each of these *de facto* districts a freeholder is assigned. Beyond this we need not at this time go." And the headnote prefixed to the case, prepared by the learned judge who delivered the opinion of the court, is as follows: "*Quære—* whether assembly districts may have any legal existence as political subdivisions of the county." Gardner *v.* Newark, although decided twelve years before, was not referred to by the court. With this judicial action of the highest court in the state, we are not at liberty to treat this question as *res adjudicata.*

The contention in the next place is, that the purpose and intent of these constitutional provisions have, by contemporaneous construction, long usage and practical interpretation, become established, and at this day the subject is not open for discussion.

For the first eight years after the new constitution was adopted—from the fall of 1844 to the fall of 1851 inclusive— the members of assembly were elected by the counties at large. This may be said to be the contemporaneous exposition of the

constitution.    The act of March, 1852, first created assembly districts.    This act remained in force until after the census of 1860, when, by the act of 1861, a new apportionment among the counties was made, and to some .extent a corresponding change in assembly districts.    The districts created by the acts of 1852 and 1861, which continued to exist until ·1871, conformed to county and the then existing township and ward lines.    No criticism has been made upon the fairness and equality in population with which these districts were constructed.    If the practical interpretation for the years from 1852 to 1870 inclusive gave construction to the constitution, that construction will not sustain the act of 1891. The result of the districting in the county of Essex by that act has already been stated.    The districts into which the county was divided are unequal in population, and the legal voters of the county are so adjusted in the several districts that of the eleven members apportioned to the county, eight members are elected by majorities aggregating three thousand seven hundred and seventy-one votes, and the other three by majorities aggregating five thousand and eighty-seven votes. The inequalities in other counties appear by map A on the part of the relators, conspicuous among which are those in the counties of Burlington and Camden—Burlington being divided into two districts, with the population respectively of twenty-two thousand five hundred and fifty-five and thirty-four thousand two hundred and four ; Camden into three districts, with the population respectively of sixty-one thousand five hundred and ten, fifteen thousand five hundred and six, and ten thousand six hundred and seventy-one.

A new system of constructing assembly districts was introduced by the act of 1871, plainly for the furtherance of political purposes.    Township, ward and city lines were disregarded, and assembly districts were carved out within the counties without regard to population, and were so devised, by massing together the qualified voters of one political party, as to secure to the minority of qualified voters of the county an unjust advantage in the choice of members of the assem-

bly—the members of that body, representing counties, being no longer "elected by the legal voters of the counties respectively." This was conspicuously, but not exclusively, the case in the county of Hudson. *Exhibit No. 9* on the part of the defendants discloses the result of the first election under that act, and the return of the votes in the second election district of that county illustrates the object that may be effectuated by the arbitrary establishment of districts that shall mass in one district a great body of the qualified voters of one political party. The "Horseshoe District" is as well known in this state as a synonym for (to use a subdued expression) unfair political methods as is the word "gerrymander" throughout the United States. At the legislative session of 1878, seven different acts were passed altering assembly districts in the several counties. In 1881 a new apportionment was made and new districts were created, some of which were remodeled in 1889. In 1891 there was a new apportionment among the counties and new assembly districts were created, and in 1892 three acts were passed altering the districts in three counties. The maps and election returns made exhibits in this case show districts with areas of grotesque shapes—inequalities in population and the massing in districts of the voters of one political party to overcome the constitutional rights of the legal voters of the counties to equality in the choice of representatives of the county in the general assembly.

The maps and exhibits which, by the written stipulation of counsel, are evidence in these cases, exhibit the capacity that lies in the assembly district system to enable the political party that happens to control the legislature to provide means for its continuance in power. Certain it is that if the legislative usage and practice, beginning in 1871 and coming down to the present time, has established a construction of the constitution that is now a finality, then it must be conceded that the legislative power and discretion in the premises are unqualified and unrestrained; and, to adopt the language of the brief of the defendants' counsel: "There is not any

constitutional restriction upon the lawmaking power controlling or directing the subdivision of counties into assembly districts. The division may be fair or unfair, equal or unequal, proportionate or disproportionate, and this court may not review the exercise of that power."

How far contemporaneous exposition, long usage and practical interpretation shall control in the construction of constitutional provisions, is the vital question on this branch of the case.

Contemporaneous construction and long usage, and especially the practical interpretation by the various departments of the government, are entitled to great weight in the construction of constitutional provisions. But it is only when the words of the constitution are of doubtful significance, or the meaning is obscure, that resort to extraneous aid is permissible. Mr. Justice Story, in his treatise on the *Constitution*, says : " When its terms are plain, clear and determinate, they require no interpretation, and it should therefore be admitted, if at all, with great caution, and only from necessity, either to escape some absurd consequence or to guard against some fatal evil." And, again : " Contemporary construction is properly resorted to to illustrate and confirm the text, to explain a doubtful phrase or to expound an obscure clause. * * * It can never abrogate the text; it can never narrow down *its true limitations*; it can never enlarge *its natural boundaries*." 1 *Story Const.*, §§ 405, 407.

The case most frequently cited to illustrate the effect of contemporaneous construction, long use and practical interpretation in the construction of constitutional provisions is *Stuart* v. *Laird*, 1 *Cranch* 299. Congress passed an act establishing Circuit Courts and designated the justices of the Supreme Court to hold the circuits. The question before the court was whether congress possessed the power to assign justices of the Supreme Court to hold Circuit Courts, or whether the judges of those courts should be specially appointed as such and have distinct commissions for that purpose. The only provisions of the federal constitution relating to the organizing of

courts and the mode of appointment are those that provide
that the judicial power of the United States should be vested
in one Supreme Court and such inferior courts as congress
may from time to time ordain and establish, and that the
power of appointing judges of the Supreme Court and all
other officers of the United States whose appointments were
not therein otherwise provided for should vest in the presi-
dent, by and with the advice and consent of the senate.  The
constitution had nowhere defined the duties of the justices of
the Supreme Court; nor did it contain any express designa-
tion of the persons by whom the inferior courts established
by congress should be held.  The only other provision there
was on the subject was that the judges both of the Supreme
and inferior courts should hold office during good behavior,
and should receive a compensation which should not be
diminished during their continuance in office.  It being left
undefined in the constitution by what judges these courts
should be held, the court considered the practical exposition,
by long practice and acquiescence, to have fixed the construc-
tion of the constitution in a matter which the language of
that instrument left in a state of uncertainty.  *Rogers* v.
*Goodwin,* 2 *Mass.* 475, is another case in the same line of
decision.  A statute passed in 1636 authorized the freemen
of every town to *dispose* of their lands, and in the preamble
of another statute, passed in 1753, it was recited that the
proprietors of lands lying in common have power " to man-
age, *dispose* and divide the same in such way and manner as
hath been or shall be concluded and agreed on by the major
part of the interested."  Under this authority the proprietors
of the town made conveyance by deed to a stranger.  The
point relied on against the validity of this deed was that the
proprietors had no authority to sell lands to a stranger.  The
conveyance was sustained on the legal ground that long and
continued usage furnished a contemporaneous construction,
which must prevail over the mere technical import of the
words.  It will be observed that the statute in question con-
tained no provision with respect to the manner in which com-

mon lands should be disposed of. The act was silent on that subject. Neither of these cases is pertinent to the subject under discussion, for the constitutional provisions under consideration expressly provide that members of the assembly shall be elected by the legal voters of the county, and qualified voters resident in the county are declared to be entitled to vote for all officers elective by the people.

Judge Cooley states the controlling principle in this language: "Where no ambiguity or doubt appears in the law, the same rule obtains here as in other cases, that the court should confine its attention to the law, and not allow extrinsic circumstances to introduce a difficulty where the language is plain. To allow force to a practical construction in such a case would be to suffer manifest perversions to defeat the evident purpose of the lawmakers." And the same learned jurist, after citing Stuart *v.* Laird, Rogers *v.* Goodwin, and other cases of similar import, which the author says appear on first reading not to have observed proper limitations, concludes his observations in these words: "It is believed, however, that in each of these cases an examination of the constitution left in the minds of the judges sufficient doubt upon the question of its violation to warrant their looking elsewhere for aids in interpretation, and that the cases are not in conflict with the general rule as above laid down. *Acquiescence for no length of time can legalize a clear usurpation of power, where the people have plainly expressed their will in the constitution, and appointed judicial tribunals to enforce it.* A power is frequently yielded to merely because it is claimed, and it may be exercised for a long period, in violation of the constitutional prohibition, without the mischief which the constitution was designed to guard against appearing, or without anyone being sufficiently interested in the subject to raise the question; but these circumstances cannot be allowed to sanction a clear infraction of the constitution. We think we allow to contemporary and practical construction its full legitimate force when we suffer it, where it is clear and uniform, to solve

in its own favor the doubts which arise on reading the instrument to be construed." *Cooley Const. Lim.* 84, 85.

An examination of the cases in the Supreme Court of the United States will disclose the fact that long usage, contemporaneous construction and practical interpretation have been resorted to in construing statutes and constitutional provisions only to ascertain the meaning of technical terms, or to confirm a construction deduced from the language of the instrument, or explain a doubtful phrase, or to expound an instrument obscurely expressed and of uncertain meaning. *Calder* v. *Bull,* 3 *Dall.* 386 ; *United States* v. *Wilson,* 7 *Pet.* 150 ; *Martin* v. *Hunter's Lessee,* 1 *Wheat.* 304 ; *Cohens* v. *Virginia,* 6 *Id.* 264 ; *United States* v. *Dickson,* 15 *Pet.* 141, 161 ; *Prigg* v. *Commonwealth of Pennsylvania,* 16 *Id.* 539, 621, 622 ; *Cooley* v. *Board of Wardens,* 12 *How.* 299, 314, 315 ; *Hahn* v. *United States,* 107 *U. S.* 402, 406 ; *Lithographic Co.* v. *Sarony,* 111 *Id.* 53, 56, 57 ; *Brown* v. *United States,* 113 *Id.* 568, 571 ; *McPherson* v. *Blacker,* 146 *Id.* 1, 27. In United States *v.* Dickson Mr. Justice Story said : "The construction given by the treasury department to any law affecting its arrangements and concerns is certainly entitled to great respect. Still, however, if it is not in conformity to the true intendment and provisions of the law, it cannot be permitted to conclude the judgment of a court of justice. * * * It is not to be forgotten that ours is a government of laws and not of men, and that the judicial department has imposed upon it by the constitution the solemn duty to interpret the laws in the last resort ; and however disagreeable that duty may be in cases where our judgment shall differ from that of other high functionaries, it is not our liberty to surrender or to waive it." These observations were made by a learned jurist with respect to the construction of statutes which are laws subject to alteration or repeal at any time in the discretion of the legislative department of the government. They apply with irresistible force to the fundamental instrument of government—the constitution—the supreme and irresistible power to make or unmake which (to quote the language of Chief Justice Marshall

in Cohen *v.* Virginia) " resides only in the whole body of the people, and not in any subdivisions of them."

In this state the rule of construction is stated with accuracy and discrimination in *State* v. *Kelsey,* 15 *Vroom* 1.   The subject is discussed by the Chief Justice in his opinion (at *p.* 22), and by Mr. Justice Magie in his dissenting opinion (at *p.* 47), with a citation of authorities.   The conclusion reached by the court is stated in the head-note as follows : "A statute of uncertain meaning, which has been enforced in a certain sense for a long series of years by the different departments of government, will be judicially construed in that sense." . The majority of the court, finding the language of the statute broad enough to embrace the meaning contended for, permitted a practical construction of it to that effect for more than fifty years to prevail.

The subject was again brought under judicial decision in *Engeman* v. *State,* 25 *Vroom* 247.   The question before the court in that instance was the constitutionality of an act of the legislature, passed in 1855, making justices of the Supreme Court *ex officio* judges of the Court of Common Pleas, Orphans' Court and Court of Quarter Sessions.   State *v.* Kelsey was cited with approbation by Mr. Justice Van Syckel, in delivering the opinion of the court.   But it will be observed that the learned judge (at *p.* 252) lays particular stress upon the fact that the constitution gave the legislature power to alter or abolish all these courts, as the public good might require; and that the power to alter or abolish seemed necessarily to imply and carry with it authority to change or modify the structure of the court, as well in the mode of appointment as in the number of the judges. The learned judge therefore concluded that the power of the legislature over the controverted subject was unrestrained by the fundamental law.   To such a condition of affairs, State *v.* Kelsey was properly applied.   Neither of these precedents can be invoked as justifying long usage or practical interpretation as controlling the construction of constitutional or statu-

tory law, unless under the exceptional circumstances above mentioned.

Nor are we without precedents directly affirming the domination of the constitution, notwithstanding long usage and practical construction to the contrary and the most conclusive arguments *ab inconvenienti.* I refer to *Dred Scott* v. *Sandford,* 19 *How.* 393, and *Hepburn* v. *Griswold,* 8 *Wall.* 603. In the first of these cases the federal court, in 1856, decided that the eighth section of an act of congress passed in 1820, and known as the Missouri Compromise act, which prohibited slavery in all that part of the territory ceded by France under the name of Louisiana, lying north of the line of thirty-six degrees and thirty minutes, not included within the limits of Missouri, was unconstitutional and void, notwithstanding the fact that the act was designed as a final settlement of the agitation of the slavery question, and a state had been admitted into the Union under its provisions, and that congress, from its first session down to the year 1848, had repeatedly exercised the power which was denied by that decision, and notwithstanding the doctrine of a practical construction continued through a long series of years, was invoked by the dissentient judges. The keynote of that decision is expressed by the Chief Justice (at *p.* 426) in these words : "No one, we presume, supposes that any change in public opinion or feeling should induce the court to give to the words of the constitution a more liberal construction than they were intended to bear when the instrument was framed and adopted. Such an argument would be altogether inadmissible in any tribunal called on to interpret it. If any of its provisions are deemed unjust, there is a mode prescribed in the instrument itself by which it may be amended, but while it remains unaltered it must be construed now as it was understood at the time of its adoption. It is not only the same in words, but the same in meaning, and delegates the same powers to the government and reserves and secures the same rights and privileges to the citizen ; and as long as it continues to exist in its present form, it speaks not only in the same words, but with the same

meaning and intent with which it spoke when it came from the hands of its framers, and was voted on and adopted by the people of the United States. Any other rule of construction would abrogate the judicial character of this court, and make 'it the mere reflex of the popular opinion or passion of the day." Whatever criticisms were made upon the result of this decision or its policy, in the discussions that followed its promulgation, the soundness of the doctrine of the supremacy of the constitution whenever invoked, so forcibly expressed by the Chief Justice, has never been denied or impugned.

In Hepburn *v.* Griswold, acts of congress passed in 1862 and 1863, making treasury notes of the United States a legal tender for debts, were in 1869 declared to be unconstitutional. This decision was subsequently overruled in the *Legal Tender Cases*, 12 *Wall.* 457. But in both of these cases the court rested its opinion on the language in which the constitutional grant of power to congress was expressed. In the decision of the latter case, Mr. Justice Strong, in delivering the opinion of the court, refers to the situation of the country at the time these acts were passed, and the "great business derangement, widespread distress and rank injustice" that would result if these acts were held to be invalid; but he adds: ",The consequences of which we have spoken, serious as they are, must be accepted if there is a clear incompatibility between the constitution and the Legal Tender acts." The authority of congress to pass the acts in question was, in the opinion of the court (at *pp.* 533, 534), deduced from the last clause of the eighth section of the first article of the constitution, granting the power to congress to make all laws which should be necessary and proper for carrying into execution the powers by the constitution conferred upon congress. "The means or instrumentalities referred to in that clause, and authorized (it was said by the learned judge who prepared the opinion of the court), are not enumerated or defined ; * * * they were left to the discretion of congress, subject only to the restrictions that they be not prohibited, and be

necessary and proper for carrying into execution the enumerated powers given to congress."

Precedents of the same import are numerous in the federal and state courts. I have cited Scott *v.* Sandford and Hepburn *v.* Griswold for the reason that the interests involved in these cases gave these decisions a conspicuous place in the domain of constitutional law.

The constitution contains the permanent will of the people. It is paramount to the power of the legislature, and can be revoked or altered only by the power which created it. Popular government can be maintained only by upholding the constitution at all times and on all occasions as it was when it came from the hands of the people, by whose fiat it was established as the fundamental articles of government, to abide until altered by the authority which created it. To adopt the language of Chief Justice Bronson, in *Oakley* v. *Aspinwall,* 3 *N. Y.* 568 : " There is always some plausible reason for the latitudinarian constructions which are resorted to for the purpose of acquiring power—some evil to be avoided, or some good to be attained by pushing the powers of the government beyond their legitimate boundary. It is by yielding to such influences that constitutions are gradually undermined and finally overthrown. * * * One step taken by the legislature or the judiciary in enlarging the powers of the government opens the door for another, which will be sure to follow ; and so the process goes on, until all respect for the fundamental law is lost, and the powers of the government are just what those in authority please to call them."

Within the domain of construction there is room for argument and discussion—nay, even for a diversity of opinion ; but when the meaning of the constitution, interpreted by its letter and in its spirit, is ascertained, extraneous considerations are of no avail. In the process of construction, long usage and practical interpretation are entitled to great weight if the language be obscure or doubtful ; but such extraneous considerations cannot be allowed " to abrogate the text " or " fritter away its obvious sense."

I have already said that, on a construction of the words of the constitutional provision regulating this subject, fortified by the policy and institutions which prevailed in this state prior to the framing of the constitution, and a comparison of other of its provisions, the constitutional mandate requires the election of members of the general assembly by the legal voters of the counties respectively, and that the division of counties into assembly districts and the distribution of the members among these districts for the purpose of electing such members is in conflict with the constitutional mandate. No one can examine the legislation on this subject from 1871 to the present time and contemplate the results without realizing the evils which have been fostered under this system. Relief from these wrongs through the ballot-box cannot be assured, the majority in the legislature being elected under this system by a minority of the legal voters of the state. Precedent has been followed by retaliation, to be repeated from time to time as supremacy in the legislature has passed from one political party to the other. For this condition of affairs the only remedy is by a return to constitutional methods. If it be that the election of members of the general assembly in districts furnishes a more perfect system of popular representation in the popular branch of the legislature, the change devolves upon the people who made, and who alone can alter the constitutional method of electing these representatives; and it may be affirmed with considerable confidence, that if such a power be conferred upon the legislature it will be accompanied with qualifications and conditions that will secure to each qualified voter equality in the election of representatives, as nearly as may be.

The remaining question is whether these proceedings were prematurely instituted, the contention being that a previous demand and refusal to perform a duty are essential to an application for a *mandamus* in any case and under all circumstances.

There is a distinction between duties of a public nature and duties of a private nature affecting only the rights of

individuals.   In the latter class of cases demand and refusal
are held to be necessary as a condition precedent to relief by
*mandamus.*   In the former class, the duty being of a public
nature, there is not the same necessity. for a literal demand
and refusal.   In such cases the law itself stands in lieu of a
demand, and omission to perform the required duty is an
equivalent for a refusal.   *High Mand.,* § 13.

To postpone the commencement of these proceedings until
the time preceding the annual elections, at which the county
clerk and the clerks of the cities and townships of the county
are required to perform the duties devolved upon them under
the election laws, would effectually prevent proceedings then
instituted being practically of any avail.   The testimony of
the county clerk and of other election officers taken under
this rule makes it apparent that these officials intend to con-
duct elections in the county, under the act of 1891, until
otherwise directed, so long as that act is unrepealed.   Indeed,
the presumption is not to be entertained that these officers
would, on constitutional grounds, disregard an act of legisla-
tion conforming to precedents of upwards of twenty years'
standing, unless the invalidity of the act be first judicially
determined.   In McPherson *v.* Blacker, the writ was allowed
on the answer of the secretary of state, denying that he had
refused to give the notice of election required by the petition
for the writ, but averring that he intended to give notices
under the law the constitutionality of which was assailed, as
will appear by the report of the case in 146 *U. S.* 3.

The rule to show cause should be made absolute for a per-
emptory *mandamus* commanding that all future general elec-
tions for members of the general assembly, in the county of
Essex, shall be so conducted that such members shall be voted
for throughout the county, as prayed for by the relators.   To
this extent the rule to show cause is made absolute, without
costs.

Justices REED and LIPPINCOTT concur in this opinion.